TIMOTHY C. FOX
Montana Attorney General
MATTHEW T. COCHENOUR
Acting Solicitor General
HANNAH E. TOKERUD
PATRICK M. RISKEN
Assistant Attorneys General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone:  406-444-2026
Fax:  406-444-3549
mcochenour2@mt.gov
hannah.tokerud@mt.gov
prisken@mt.gov

COUNSEL FOR DEFENDANT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| MONTANA GREEN PARTY, DANIELLE BRECK, CHERYL WOLFE, HARRY C. HOVING, DOUG CAMPBELL, STEVE KELLY, ANTONIO MORSETTE TAMARA R. THOMPSON, and ADRIEN OWEN WAGNER, <br><br> Plaintiffs, <br><br> v. <br><br> COREY STAPLETON, in his official capacity as Secretary of State for the State of Montana, <br><br> Defendant. | CV-18-87-H-BMM-JTJ <br><br> **DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES......................................................... iii

INTRODUCTION....................................................................1

FACTS ..............................................................................1

SUMMARY JUDGMENT STANDARDS..................................8

ARGUMENT .......................................................................9

I.   Montana is entitled to summary judgment on Count I
     because the signature requirements for political parties do
     not severely burden the Green Party's First Amendment
     rights and are justified by Montana's interests in achieving
     orderly elections........................................................... 9

     A.   The Green Party fails to demonstrate that the
          signature requirements for political parties impose a
          severe burden .....................................................11

          1.   The signature requirement is not a severe burden ......12

          2.   The distribution requirement is not a severe burden ..16

          3.   The filing deadline is not a severe burden.....................18

     B.   Montana's interests in orderly elections justify the
          minimal burdens on a political party's ability to access
          the ballot ...........................................................21

II.  Montana's statutory formula allowing new parties to obtain
     signatures based on a percentage of votes cast in the last
     election or 150 signatures, whichever is less, does not violate
     equal protection ........................................................... 26

     A.   The Party fails to show any injury caused by the
          statutory formula, and thus, it lacks standing ...................27

     B.   Moreover, the statutory formula does not violate equal
          protection ............................................................28

CONCLUSION ...................................................................................... 32

CERTIFICATE OF COMPLIANCE ....................................................... 33

CERTIFICATE OF SERVICE ................................................................ 33

INDEX OF EXHIBITS ........................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*American Party of Texas v. White,*
  415 U.S. 767 (1974) ............................................................ 11, 20, 29

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986) ........................................................ 8, 9

*Angle v. Miller,*
  673 F.3d 1122 (9th Cir. 2012) ........................................... 17

*Arizona Green Party v. Reagan,*
  838 F.3d 983 (9th Cir. 2016) .................................... 15, 18, 23, 25, 26

*Arizona Libertarian Party v. Hobbs,*
  925 F.3d 1085 (9th Cir. 2019) .................................... *passim*

*Arizona Libertarian Party v. Reagan,*
  798 F.3d 723 (9th Cir. 2015) ................................... 10, 11, 12

*Buckley v. American Constitutional Law Foundation,*
  525 U.S. 182 (1999) ................................................. 9

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ............................................... 10, 28, 29

*Celotex v. Catrett,*
  477 U.S. 317 (1986) ........................................................ 8, 9

*Democratic Party of Hawaii v. Nago,*
  833 F.3d 1119 (9th Cir. 2016) ........................................... 11

*Idaho Coalition United for Bears v. Cenarrusa,*
  342 F.3d 1073 (9th Cir. 2003) ........................................... 30

*Jenness v. Fortson,*
  403 U.S. 431 (9th Cir. 1971) .................................... 12, 13, 15, 16, 21

*Lemons v. Bradbury,*
  538 F.3d 1098 (9th Cir. 2008) ........................................... 28

*Libertarian Party v. Bond,*
 764 F.2d 538 (8th Cir. 1985) ...................................................... 31, 32

*Lorona v. Arizona Summit Saw School, LLC,*
 151 F. Supp. 3d 978 (D. Ariz. 2015) ................................................ 32

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ......................................................................... 27

*Storer v. Brown,*
 415 U.S. 724 (1974) ................................................................... 10, 12

*Williams v. Rhodes,*
 393 U.S. 23 (1968) ........................................................................... 13

**United States Code**
 52 U.S.C. § 20302(a)(8) .................................................................... 23

**Federal Rules of Civil Procedure**
 56(a) ..................................................................................................... 8

**Montana Code Annotated**
 § 13-10-211 ........................................................................................ 15
 § 13-10-601 .............................................................................. 8, 9, 29
 § 13-10-601(1) ..................................................................................... 2
 § 13-10-601(2) ............................................................................. 2, 29
 § 13-10-601(2)(b) ...................................................................... 14, 26
 § 13-10-601 (1997) ............................................................................. 3
 § 13-10-601 (1999) ............................................................................. 4
 § 13-13-205 ........................................................................................ 23

**Other**
 Bennion, Jon, *Big Sky Politics: Campaigns and Elections in Modern
 Montana* (2004) ................................................................................... 8

## INTRODUCTION

Montana has a long history of political participation by minor parties and minor party candidates. Since statehood, hundreds of independent and third-party candidates have run for office and been represented on the ballot. In 1999, the Montana Legislature made it even easier for minor political parties to get on the ballot. But Montana's ballot is not a free-for-all, and to maintain the integrity of the election process, the State requires that parties show a modicum of support before they earn a place on the ballot.

Montana ensures these interests are met by requiring a political party that petitions for the ballot to obtain 5,000 signatures from at least one-third of the State's legislative districts and to file its petition in time for ballots to be distributed to military and overseas voters. These requirements serve the State's interests without imposing a severe burden on a minor party's constitutional rights. There are no material facts at issue, and the Court should grant summary judgment in favor of Montana.

## FACTS

Montana law governs how political parties can obtain state recognition. A party may nominate candidates by primary election if it

had a candidate for a statewide office in the previous election who received 5% or more of the number of votes cast for the successful gubernatorial candidate. Mont. Code Ann. § 13-10-601(1). A party that fails to qualify under this framework can qualify by submitting a petition signed by registered voters requesting a primary election. Mont. Code Ann. § 13-10-601(2). The number of signatures required is either 5,000 or 5% of the total votes cast for the successful gubernatorial candidate in the last election, whichever is less. *Id*. Any registered voter can sign the petition; however, the number must include signatures from 34 legislative districts equal to 5% or more of the total votes cast for the last successful governor or 150, whichever is less. *Id*.[1]

Plaintiffs (collectively, "the Green Party" or "Party") challenge the second method for obtaining recognition, the petition process. *See* Doc. 9 at 17. Before 1999, political parties could gain ballot access by petition only if they obtained a number of signatures equal to 5% or more of the votes cast for the last successful candidate for governor. *See*

---

[1] Even if the party does not qualify statewide, it can still nominate candidates using the petition process outlined in Mont. Code Ann. § 13-10-501 to 507; Corson Decl., ¶ 35. The Green Party has not challenged these statutes.

Mont. Code Ann. § 13-10-601 (1997). There was no option of obtaining a lesser number of signatures. *Id*.

That changed following the 1996 reelection of Governor Marc Racicot. The election was unusual in that Racicot's opponent, Democrat Chet Blaylock, died a few weeks before the election while traveling to a debate. Jon Bennion, *Big Sky Politics: Campaigns and Elections in Modern Montana* 115 (Five Valleys Publishing 2004). Governor Racicot went on to overwhelmingly win the election, prevailing in all 56 counties. *Id*. at 253. In total, Governor Racicot received 320,768 votes. *Id*. While the lopsided victory was good news for Governor Racicot, the upshot for minor parties was that, for the next two election cycles, they would need at least 16,038 signatures to get on the ballot because of the 5% requirement.

The 1999 Montana Legislature enacted legislation to make it easier for parties to get on the ballot and to make the signature requirements more stable and more consistent. *See, e.g.*, Mont. S. Comm. on State Administration, *Hearing on HB 585*,

56th Leg., Reg. Sess. (March 5, 1999), Minutes at 3, 5.[2] The law allowed a party to gain recognition by gathering 5,000 signatures or 5% of the votes cast for the successful gubernatorial candidate, whichever amount is less. Mont. Code Ann. § 13-10-601 (1999). The law retained the requirement that a certain number of signatures come from one-third of the legislative districts, but it allowed parties to gather either 150 signatures or a number equal to 5% of the votes cast for the last successful governor, whichever is less. *Id.* Two minor parties, the Montana Libertarian Party and the American Heritage Party, testified in support of the new law. Cochenour Decl., Ex. B (Montana House Visitor Register for HB 585).

While there have been some legislative changes during the past two decades, the signature requirements have been constant. Other than these requirements, Montana places few restrictions on the petition process. Montana allows parties to collect signatures at any time; there is no earliest date to gather petition signatures or to submit

---

[2] For the Court's convenience, minutes from the Senate Committee hearing are attached as Exhibit A to counsel's foundational declaration. In addition to the compiled legislative history, audio recordings of the legislative hearings related to HB 585 are available at the Montana Historical Society.

signed political party petitions to county election administrators.
Doc. 19 (Statement of Stipulated Facts), ¶ 5. Further, any registered
voter can sign a petition. The voter does not have to be affiliated with
the minor party or even intend to vote for the party's candidates.
Corson Decl., ¶ 40. Voters can sign petitions for multiple minor parties
if they choose, and they can participate in any party's primary. *Id*.

In 2018, the Green Party undertook a signature-gathering effort
to collect enough signatures to be on the ballot for Montana's 2018
primary and general elections. Doc. 19, ¶¶ 2-3. The Green Party
obtained 10,160 signatures, and election officials verified 7,386 of the
petition signatures. *Id*., ¶ 6. As of the deadline for candidate filing, the
Green Party had qualified in 38 legislative districts and met the
statutory requirements to be qualified for the ballot. Doc. 19, ¶ 9;
Cochenour Decl., Ex. C (Breck Dep.) at 31. A group called Advanced
Micro Targeting (AMT) claimed responsibility for obtaining more than

9,000 signatures submitted for the Green Party.[3] Some theorized that AMT was trying to get the Party on the ballot to affect the United States Senate race in Montana. Breck Dep. at 29. The Green Party never spoke with AMT, did not hire AMT, and did not appreciate AMT's "assistance" because it threw the Green Party into "politics-as-usual" game-playing instead of convincing voters of the merits of the Party's ideals. Breck Dep. at 30.[4]

Soon after the Green Party qualified, a state lawsuit was filed by, among others, the Montana Democratic Party, challenging several signatures. Doc. 19, ¶ 8. The state court invalidated a number of signatures after finding that a signature gatherer had submitted a false affidavit, voter signatures did not match the corresponding voter registration card, some signatures had been improperly verified,

---

[3] *See Montana Democratic Party v. Advanced Micro Targeting*, COPP 2018-CFP-004, available on the Commissioner of Political Practice's website: https://politicalpractices.mt.gov/Portals/144/2018decisions/MDC%20v.%20AMT%20Suff%20Dec_Final.pdf?ver=2018-07-20-150151-903. This Court can take judicial notice of the Commissioner's decision. *See Daniels-Hall v. National Educ. Assn.*, 629 F.3d 992, 998-99 (9th Cir. 2010) (court may take judicial notice of agency documents from governmental websites).

[4] AMT did not respond to Montana's Rule 45 subpoena seeking information about its signature gathering.

signatures were matched to the wrong registered voters, petition entries contained no date or were postdated or altered, and some petition entries did not contain a printed name. *Id.*, ¶ 10. After the court invalidated these signatures, the Green Party no longer qualified in the required 34 legislative districts, and the state court removed the Party from the ballot. *Id.*, ¶ 12.

While the state proceeding was ongoing, the Green Party continued to campaign for its candidates. For example, the Party's website informed readers that, although the question of party recognition was before the courts, voters could still write in Green Party candidates, and the Party encouraged readers "to get to the polls and make your voice heard!" Cochenour Decl., Ex. D (Green Party website); Breck Dep. at 33. In addition to encouraging write-in votes, the Party continued to talk with neighbors and engage in social media outreach to promote the Green Party's platform and its candidates. Breck Dep. at 34-37. The Party also continued to endorse candidates. Cochenour Decl., Ex. E (Party endorsement list). Although the Green Party did not get on the 2018 ballot, several Plaintiffs cast write-in votes for the Party's candidates. Breck Dep. at 43-44; Cochenour Decl., Ex. F

(Morsette Dep.) at 22; Cochenour Decl., Ex. G (Wagner Dep.) at 45; Cochenour Decl., Ex. H (Wolfe Dep.) at 15-16; Cochenour Decl., Ex. I (Campbell Dep.) at 32-33.

Following the state court decision, the Green Party filed a notice of appeal with the Montana Supreme Court. However, it soon moved to dismiss its state appeal, and filed this federal action. Doc. 19, ¶¶ 13-15. The Green Party challenges Mont. Code Ann. § 13-10-601 under the First Amendment and the Fourteenth Amendment. Doc. 29, ¶ 1.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it could "affect the outcome" of a lawsuit, and an issue is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). The moving party need not disprove its opponent's claims, but must only show or "point[] out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).

A court must grant summary judgment if the nonmoving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party's failure "renders all other facts immaterial." *Id*. at 323. Moreover, a "scintilla of evidence" is insufficient; the question is whether a jury could find for the nonmoving party on the evidence presented. *Anderson*, 477 U.S. at 252.

## ARGUMENT

**I.   Montana is entitled to summary judgment on Count I because the signature requirements for political parties do not severely burden the Green Party's First Amendment rights and are justified by Montana's interests in achieving orderly elections.**

In Count I, the Green Party asserts that Mont. Code Ann. § 13-10-601 violates the First Amendment by burdening Plaintiffs' rights to associate, to cast votes effectively, and to petition. Doc. 29, ¶ 52. Montana is entitled to summary judgment on this claim because its interests in ensuring the integrity of its elections process outweigh the burdens that Montana's ballot access laws place on the Green Party.

While there is no question that individuals have the right to associate and to vote, it is equally settled that States have "considerable leeway" to protect the integrity of the elections process. *Buckley v.*

9

*American Constitutional Law Foundation*, 525 U.S. 182, 191 (1999). The Supreme Court has recognized that, under the Constitution, "States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). And the Court has recognized that States must have an "active role in structuring elections" and that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

In election law challenges, courts balance the severity of the burden the law imposes on First Amendment rights against the interests advanced by the State as justifications, taking into account the "extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (citation omitted). Courts will uphold election laws that impose a severe burden if the laws are narrowly tailored to a compelling state interest. *Id.* Courts apply less exacting review to laws that impose lesser burdens and generally will uphold them based on the State's important regulatory interests. *Id.*; *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015).

The Ninth Circuit describes this standard as a "sliding scale" approach: "the more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019). The severity of the burden that election laws impose is a question of fact. *Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1123 (9th Cir. 2016). As the party challenging Montana's election system, the Green Party bears the burden of proving that Montana's laws impose a burden on its rights. *Id*. at 1122.

### A.   The Green Party fails to demonstrate that the signature requirements for political parties impose a severe burden.

In determining the severity of burdens that election laws place on minor parties' ballot access, the Ninth Circuit examines the entire statutory framework. *Arizona Libertarian Party v. Reagan*, 798 F.3d at 730. The Court has repeatedly affirmed that "requiring a demonstration of 'significant, measurable quantum of community support' does not impose a severe burden." *Hobbs*, 925 F.3d at 1092 (quoting *American Party of Texas v. White*, 415 U.S. 767, 782 (1974)). In this analysis, the "relevant inquiry is whether 'reasonably diligent'

11

minor party candidates can normally gain a place on the ballot, or if instead they only rarely will succeed." *Arizona Libertarian Party v. Reagan*, 798 F.3d at 730 (internal citations and quotation marks omitted).

### 1.   The signature requirement is not a severe burden.

Montana's statutory framework does not impose a severe burden on the Green Party. Supreme Court and Ninth Circuit precedent establish that requiring parties to obtain signatures equal to 5% of the number of votes cast in a previous election is not a severe burden. In *Jenness v. Fortson*, the Supreme Court upheld a Georgia requirement that minor party candidates file a petition containing a number of signatures equal to at least 5% of registered voters at the last general election for the office sought. 403 U.S. 431, 438 (1971). The Ninth Circuit recently invoked *Jenness*, among other cases, for the proposition that requiring support from 5% of voters does not constitute a severe burden. *Hobbs*, 925 F.3d at 1091 ("there is no dispute that a state may require a candidate to demonstrate support from slightly, but not 'substantially,' more than 5% of voters without imposing a severe burden triggering heightened scrutiny") (citing *Storer*, 415 U.S.

12

at 739-40; *Jenness*, 403 U.S. at 442; *Williams v. Rhodes*, 393 U.S. 23, 24-25 (1968)).

In reaching its holding, the *Jenness* Court noted that, unlike some states, Georgia did not impose unnecessarily elaborate "election machinery" on new political parties. *Jenness*, 403 U.S. at 438. For example, Georgia allowed write-in votes, it did not have an unreasonably early filing deadline, and political organizations were free to endorse any eligible person for a candidate. *Id*. Moreover, small parties and candidates were "wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought" they desired. *Id*. Nor did Georgia impose "suffocating restrictions" upon the parties' nominating petitions. *Id*. In Georgia, a voter could sign a petition even if they previously had signed another; a voter who signed a petition for a nonparty candidate was nonetheless free to vote in a party's primary; and a petition-signer was not required to disclaim a vote for a different candidate. *Id*. at 438-39.

*Jenness* and *Hobbs* control here, and the Court should hold that Montana's statutory framework imposes only a minimal burden. First, Montana's signature requirement would not impose a severe burden

13

even if a party's only path to the ballot required 5% of the total votes cast. *See Hobbs*, 925 F.3d at 1091. But Montana does not require that many signatures. Montana's "5% requirement" only applies to the votes the winning candidate received, not the total number of votes cast in the election. Mont. Code Ann. § 13-10-601(2)(b). For 2018, 5% of the votes cast for the successful gubernatorial candidate equaled 12,797. Corson Decl., ¶ 36. But Montana does not even require that many signatures because a party may present a petition with 5,000 signatures if that number is less. Mont. Code Ann. § 13-10-601(2)(b). Five thousand signatures amount to only 1.95% of the votes cast for the successful governor in 2016. Corson Decl., ¶ 36.

Testimony from C.B. Pearson, a Montanan with decades of experience in signature gathering, also supports that the signature requirement is not a severe burden. Pearson testified that there are three main types of petitioning for signatures: location petitioning, event petitioning, and door-to-door petitioning. Pearson Decl., Ex. A at 4-5. He explained that by employing a combination of these types of petitioning, a proponent of a petition can achieve success. *Id*. In his opinion, "the number of valid signatures required to qualify as a

political party is small and easily within the petitioning ability of any group of Montanans." Pearson Decl. at 3; Ex. A at 3, 7-9. In short, obtaining the required number of signatures does not constitute a severe burden, particularly since there is no earliest date to begin collecting signatures. Doc. 19, ¶ 5.

Further, like the ballot access framework upheld in *Jenness*, Montana does not impose "suffocating restrictions" in our party ballot access laws. Montana allows write-in votes. *See* Mont. Code Ann. § 13-10-211; Corson Decl., Ex. B (sample ballot instructing that "To write in a name, completely fill in the oval to the left of the line provided, and on the line provided print the name of the write-in candidate for whom you wish to vote."). And, while Montana has filing deadlines 85 to 92 days before the primary, that is significantly shorter than other filing deadlines that the Ninth Circuit has upheld. *See Arizona Green Party v. Reagan*, 838 F.3d 983, 987 (9th Cir. 2016) (upholding deadline that required minor parties to submit a petition for party recognition 180 days before the primary election). Nothing in Montana law prohibits political organizations or minor parties from endorsing candidates. Further, voters can sign petitions for multiple

15

minor parties if they choose, and a voter who signs a petition remains free to vote in any party's primary. Corson Decl., ¶ 40.

And, as in *Jenness*, small parties and candidates are "wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought" they desire. *Jenness*, 403 U.S. at 438. In fact, in this case, the Green Party did just that. Even while their party status was being challenged, the Green Party engaged in door-to-door and social media campaigning, and it continued to promote the Party's platform. Breck Dep. at 33-39. The Green Party continued to endorse candidates, and it encouraged write-in votes for those candidates. Cochenour Decl., Exs. D, E. Further, several Plaintiffs cast write-in votes for Green Party candidates. Breck Dep. at 43-44; Morsette Dep. at 22; Wagner Dep. at 45; Wolfe Dep. at 15-16; Campbell Dep. at 32-33.

> ## 2. The distribution requirement is not a severe burden.

Nor does the distribution requirement impose a severe burden. As the Ninth Circuit has noted, "geographic distribution requirements are commonplace at the ballot access stage," and the Court has presumed that they are "permissible for signature collection, so long as they

16

involve districts with equal populations." *Angle v. Miller*, 673 F.3d 1122, 1130-31 (9th Cir. 2012). Notably, the Green Party collected signatures from 47 legislative districts and, prior to the state court lawsuit, qualified in 38 legislative districts. Doc. 19, ¶¶ 7, 9.

Even Danielle Breck, the Party's coordinator and 30(b)(6) designee, admitted that the ability to obtain 150 signatures in a district rather than the flat 5% amount allowed parties to get on the ballot with fewer signatures than under the previous system. Breck Dep. at 55. Pearson made a similar observation, noting that the statutory "accommodation" of capping signatures at 150 made "the job easier" and reduced the work necessary to qualify for the ballot. Pearson Decl., Ex. A at 10. Pearson opined that meeting the distribution requirement was "easily within the petitioning ability of any group of Montanans." Pearson Decl. at 3; Ex. A at 10. The Secretary of State facilitates this "easier job" by publishing a document on its website that quantifies the number of signatures required from each district. *See* Corson Decl., Ex. C.

### 3.   The filing deadline is not a severe burden.

Montana's filing deadline is also reasonable and, as mentioned, is shorter than those that have been upheld in the Ninth Circuit. In *Arizona Green Party*, for example, the court upheld a filing deadline that required minor parties to submit a petition for party recognition 180 days before the primary election. 838 F.3d at 987. In determining that the deadline did not impose a severe burden, the court considered both the absence of evidence presented by the Green Party as well as "recent historical evidence" showing that minor parties had been able to gain party recognition despite the deadline. *Id*. at 991.

Here, like in *Arizona Green Party*, the evidence shows that the filing deadline did not impose a severe burden on the Green Party. The Party's coordinator testified that they were able to meet the deadline to submit signatures. Breck Dep. at 31. And, while there is a filing deadline, there is no earliest date to begin collecting signatures. Doc. 19, ¶ 5. Moreover, Pearson explained that, with some forethought, any group can complete a petition drive by the statutory deadline. Pearson Decl., Ex. A at 5-6. His testimony also established that weather is no barrier to successful signature gathering, and he explained that

there are ideal locations and events to gather signatures in Summer,

Fall, and Winter. *Id*. Moreover, as even the Green Party acknowledges,

minor parties have been able to achieve ballot access using the petition

process eight times since 1982. Corson Decl., ¶ 41 (listing Libertarian

Party, Natural Law Party, Reform Party, Constitution Party, and

Americans Elect Party); *see* Doc. 22 (Plaintiffs' Preliminary Pretrial

Statement) at 20-21 (citing same parties). Additionally, more than 200

third-party or independent candidates have qualified for the ballot since

2000. Corson Decl., ¶ 23. Both the facts of this case and the "recent

historical evidence" establish that Montana's statutory deadline does

not constitute a severe burden.

The history of Montana's election over the past twenty years alone

shows that "reasonably diligent" minor parties can gain a place on the

ballot. Even Richard Winger, the Green Party's expert, has testified

that "Montana has a long tradition of relatively lenient ballot access for

minor parties" and that, since 1999, "Montana election laws have been

substantially easier for minor parties than for independent candidates."

Cochenour Decl., Ex. J (Winger report filed in *Kelly v. Johnson*, No.

CV 08-25-SEH (D. Mont.)).

Moreover, the Green Party itself succeeded in gaining a place on the ballot. The Party obtained more than the required number of signatures from enough legislative districts, and the Secretary of State approved the Party for the ballot. Doc. 19, ¶¶ 6, 9. That the Party was eventually removed from the ballot was not caused by Montana's statutory requirements; rather, it was the result of a signature gatherer submitting a false affidavit, signatures not matching voter registration card, postdated or altered petitions, and other irregularities. *Id.*, ¶ 10. While the Green Party may blame Montana's statutory requirements, the fact is that submitting false affidavits, altered petitions, and the like has consequences—such as getting removed from the ballot. But regardless of the Green Party's missteps, the bottom line is that the Party has failed to show that Montana's law "'imposes insurmountable obstacles' to getting on the primary ballot," and thus they have failed to establish a severe burden. *Hobbs*, 925 F.3d at 1093 (quoting *American Party*, 415 U.S. at 784).

**B.    Montana's interests in orderly elections justify the minimal burdens on a political party's ability to access the ballot.**

Because Montana's ballot access laws impose only minimal burdens, the Court's scrutiny is more relaxed. *Hobbs*, 925 F.3d at 1090. The Court should uphold Montana's ballot access laws because they serve the State's "important regulatory interests" of promoting orderly elections, reducing voter confusion, avoiding ballot overcrowding, and reducing the presence of frivolous parties and candidates.

The Supreme Court has long recognized the "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process . . . ." *Jenness*, 403 U.S. at 442. And the Ninth Circuit has held that these interests have significant importance in the context of a primary election: "Conditioning primary ballot placement on a demonstration of significant community support advances Arizona's interests in the administration of its primary *and* general elections." *Hobbs*, 925 F.3d at 1093 (emphasis in original).

21

The Ninth Circuit has accepted a State's "asserted interests" to justify ballot access laws. *See Hobbs*, 925 F.3d at 1093. The court does not require States to present any "particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies, nor proof that ballot rules are the only or the best way to further the proffered interest." *Id.* at 1094 (internal citations and quotation marks omitted).

Montana's ballot access framework serves the State's important interests. As already discussed, a State "may require a candidate to demonstrate support from slightly, but not 'substantially,' more than 5% of voters without imposing a severe burden triggering heightened scrutiny." *Hobbs*, 925 F.3d at 1091. The same logic that applies to candidates seeking ballot access applies to minor political parties. One way that Montana requires a minor party to show a modicum of support is by requiring that the petition for ballot access contain at least 5,000 signatures, which is generally fewer than 5% of the votes cast for the successful gubernatorial in the last election. Requiring a percentage or a number of signatures from voters ensures that the party actually has a modicum of support from voters before it is placed on the ballot.

22

The distribution requirement serves this interest as well. Requiring that a portion of the 5,000 signatures come from one-third of the State's legislative districts and that the number of signatures be based on a percentage of the votes cast in those districts serves the State's interest in ensuring that a new party has broad-based regional support and that only nonfrivolous parties appear on the ballot.

The deadlines associated with the primary also serve the State's interest in orderly elections, which is a well-recognized important state interest. *Arizona Green Party*, 838 F.3d at 991-92. As the Secretary of State's Elections Director sets out, Montana's statutory deadline for new parties to submit a petition is calculated by working backward from several nested deadlines relative to the election. Corson Decl., ¶ 30. For example, both federal and state law require that ballots be distributed to military and overseas voters 45 days before the election. 52 U.S.C. § 20302(a)(8); Mont. Code Ann. § 13-13-205; Corson Decl., Ex. A. For the 2020 election year, these ballots must be sent no later than April 17, 2020. Corson Decl., Ex. A.

Because the deadline for political parties to qualify with the Secretary of State is March 9, 2020, the Secretary of State's office has

only a little more than five weeks to accomplish all the required tasks before sending ballots out to military and overseas voters. These tasks include certifying the names of statewide, state district, and county candidates to the Commissioner of Political Practices; setting up election software and databases; providing notice of and conducting public tests of voting equipment; and preparing and mailing ballots. *See, e.g.*, Corson Decl., ¶ 6. While some of the tasks can be accomplished in a few days, some are more complicated and require weeks to complete. *Id.*, ¶¶ 6, 8. Preparing the ballots themselves can take two weeks, and once the ballots go to the printer, it takes another week to ten days for the printer to print the ballots. *Id.*, ¶¶ 9, 11.

In addition to preparing the ballot, the Secretary of State and county election officials have numerous tasks in the weeks leading up to an election. For example, election officials must appoint and train election judges. Corson Decl., ¶ 6. The election judge training itself takes more than a week. *Id.*, ¶ 13. Beginning thirty days before an election, officials must mail out absentee ballots for permanent absentee voters, start late voter registration, issue absentee ballots to new voters, begin administering absentee votes, and set up voting

booths and polling places, among other tasks. Corson Decl., ¶ 7. In the month before an election, most of the election officials' tasks center around absentee voting and late voter registration. *Id.*, ¶ 14.

Considering the tasks required of the Secretary of State and county election officials, Montana's filing deadline serves the State's interest in orderly elections. Notably, the State used to have a more lax deadline, which threatened disorder in the 2008 election. Prior to 2009, the filing deadline was 75 days before the primary election, rather than 85 days. In 2008, however, because of the tight statutory deadlines, the Secretary of State was unable to certify the ballots until very late in the process, leaving counties only one working day to prepare ballots. Corson Decl., ¶ 31. Nineteen counties were unable to meet the deadline and were informed that ballots might not be printed in time for distribution to military and overseas voters. *Id.* The current deadline alleviates some of the concerns from the 2008 election and advances the State's interest in orderly elections.

As in *Arizona Green Party*, the State has presented substantial evidence detailing the processes leading up to the primary and has demonstrated how the statutory framework serves the State's interests.

The deadlines and the other challenged laws serve the State's important regulatory interests in maintaining orderly elections, and the Court should grant summary judgment for the State. *See Arizona Green Party*, 838 F.3d at 991-92.

## II. Montana's statutory formula allowing new parties to obtain signatures based on a percentage of votes cast in the last election or 150 signatures, whichever is less, does not violate equal protection.

Montana law requires political parties petitioning for ballot access to obtain a portion of the 5,000 signatures from one-third of the legislative districts. The number of signatures required from these districts must equal 5% of the votes cast for the last successful governor in the district or 150, whichever is less. Mont. Code Ann. § 13-10-601(2)(b). According to the Party, this percentage requirement within the legislative districts violates equal protection because it is an "unequal petition distribution requirement" that discriminatorily impacts minor parties. *See* Doc. 29, ¶ 55. This Court should reject the Party's claim because it fails to explain how it has been injured by the statute and because the statute does not violate equal protection.

### A.   The Party fails to show any injury caused by the statutory formula, and thus, it lacks standing.

This Court should grant summary judgment for the State on the Count II because the Party has suffered no injury from the legislative district requirement, and thus, it lacks standing to pursue this claim. To establish standing, the Party must satisfy three elements: (1) that it suffered an injury in fact; (2) that the defendant's challenged conduct caused the injury; and (3) that a court decision could redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, the Party has failed to establish any injury.

The Party asserts that Montana's statutory formula results in the signature requirement varying from 55 signatures to 150 signatures depending on the district. *See* Doc. 29, ¶ 42. When asked to explain how this variance among districts could harm the Party, however, the Party failed to identify an injury. Breck first stated that "the biggest harm of that is the inability to gauge how many signatures we need in any district." Breck Dep. at 49. Later, however, she admitted that the number of signatures was posted on the Secretary of State's website and that "you go there to find that number." Breck Dep. at 75. Further, she agreed that the statutory formula could actually benefit the

Green Party because they would be able to collect fewer signatures in some districts. Breck Dep. at 52. Additionally, because the statute now allows for 5% or 150 signatures, whichever is less, Breck acknowledged that a party could get on the ballot with fewer signatures than under the previous law. Breck Dep. at 55.

In summary, the Party fails to show how it or any Plaintiff has suffered any injury that is traceable to the percentage requirement for legislative districts.[5] Because Plaintiffs have failed to demonstrate any injury, they lack standing, and the Court should grant summary judgment for Montana.

### B.   Moreover, the statutory formula does not violate equal protection.

Equal protection challenges to election laws are governed by *Burdick*'s balancing standard set forth above. *See Lemons v. Bradbury*, 538 F.3d 1098, 1103-04 (9th Cir. 2008) (applying *Burdick*'s balancing test in an equal protection challenge involving referendum signatures). As previously demonstrated, Plaintiffs have failed to establish that

---

[5] To the extent Plaintiffs believe legislative districts are treated unequally, they have failed to establish third-party standing to assert the constitutional rights of others.

Mont. Code Ann. § 13-10-601 imposes severe burdens, and thus, this Court should uphold the law based on Montana's important regulatory interests. *Burdick*, 504 U.S. at 434.

In analyzing a minor party's equal protection challenges to ballot access law, courts measure the magnitude of the burden by examining the different treatments that election laws impose on different types of parties. *Hobbs*, 925 F.3d at 1096. A party's equal protection rights are violated when "one set of requirements is 'inherently' or 'invidiously' more burdensome than the other." *Id.* (quoting *American Party*, 415 U.S. at 781).

Here, the Green Party does not really contend that Montana's framework treats it differently from any other political party, which makes sense given that the same requirements apply to any political party seeking ballot access through the petition process. *See* Mont. Code Ann. § 13-10-601(2). Instead, the Green Party asserts that Montana's structure violates the principle of one-person, one-vote. *See* Doc. 29, ¶ 54. But, as discussed above, the Party has no standing to bring claims for others, and it has failed to show an injury.

Moreover, even taking the claim at face value, there is nothing in Montana's framework that is inherently or invidiously discriminatory against a particular class of voters. Nor does a particular class of voters receive a benefit. Further, Montana's legislative-district formula is not like other states' formulas that involve unequal populations of counties, which the Ninth Circuit has found constitutionally problematic. For example, in *Idaho Coalition United for Bears v. Cenarrusa*, the Ninth Circuit confronted an Idaho law that required proponents of a ballot initiative to obtain signatures equal to 6% of statewide voters, including 6% from half of Idaho's counties, which varied in population. 342 F.3d 1073 (9th Cir. 2003). The Court determined that the 6%-county requirement violated equal protection because the law "allocate[d] equal power to counties of unequal population." *Idaho Coalition*, 342 F.3d at 1078.

Unlike the law at issue in *Idaho Coalition*, Montana's law does not allocate equal power to unequally populated counties, nor does it employ a rigid, arbitrary formula. Rather, Montana's law seeks to give equal power to the voters in each legislative district by basing the required number of signatures on a percentage of votes cast, while at

the same time capping the number of signatures required so that the burdens on a minor party are minimized.

In this regard, Montana's law is more akin to a Missouri law that the Eighth Circuit upheld against an equal protection challenge in *Libertarian Party v. Bond*, 764 F.2d 538 (8th Cir. 1985). Similar to Montana's requirement for minor parties, the Missouri law provided that minor parties could gain ballot access by presenting a petition signed by 2% of the number of votes cast for the last successful governor in half of the congressional districts. *Bond*, 764 F.2d at 539. In rejecting an equal protection challenge, the Eighth Circuit reasoned that the law did not "reflect an impermissible discrimination amongst voters." *Id*. at 544. Further, the "percentage of votes" formula provided a reasonable means to measure how many potential petition signers were in each district. *Id*. The court determined that the "percentage of votes" formula was actually superior to measuring by population: "In fact, the State's formula measures the number of potential petition signers in each district more accurately than a 'percentage of population' formula would, since the latter formula fails to reflect the fact that not all residents of a district are registered to vote." *Id*.

Like the statutory requirement at issue in *Bond*, Montana's law is not discriminatory against a particular class of voters. Nor does it create unconstitutional burdens. The Court should grant summary judgment in favor of Montana on Count II.[6]

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to Defendant on all counts.

Respectfully submitted this 27th day of September 2019.

> TIMOTHY C. FOX
> Montana Attorney General
> MATTHEW T. COCHENOUR
> Acting Solicitor General
> 215 North Sanders
> P.O. Box 201401
> Helena, MT 59620-1401
>
> */s/  Matthew T. Cochenour*
> MATTHEW T. COCHENOUR
> Acting Solicitor General
> Counsel for Defendant

---

[6] Plaintiffs' Complaint includes Count III, which alleges that Plaintiffs are entitled to injunctive relief. Declaratory and injunctive relief are remedies, but they are not standalone causes of action. *See Lorona v. Arizona Summit Saw School, LLC*, 151 F. Supp. 3d 978, 997 (D. Ariz. 2015). Because Montana is entitled to summary judgment on the Party's constitutional claims, Plaintiffs have no right to an injunctive remedy. Thus, Montana asks that the Court grant summary judgment to the State on Count III.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6,263 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

 /s/ *Matthew T. Cochenour*
MATTHEW T. COCHENOUR
Acting Solicitor General
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: September 27, 2019      */s/ Matthew T. Cochenour*
MATTHEW T. COCHENOUR
Acting Solicitor General
Counsel for Defendant

# <u>INDEX OF EXHIBITS</u>

Exhibit 1 ....................................... Declaration of Matthew T. Cochenour

Exhibit 2 ..........................................................Declaration of Dana Corson

Exhibit 3 ..........................................................Declaration of C.B. Pearson

34