Quentin M. Rhoades
State Bar No. 3969
Kristin Bannigan
State Bar No. 36435405
RHOADES SIEFERT & ERICKSON, P.L.L.C.
430 North Ryman
Missoula, Montana 59802
Telephone: (406) 721-9700
Telefax: (406) 728-5838
qmr@montanalawyer.com

James C. Linger, OBA #5441
1710 South Boston Avenue
Tulsa, Oklahoma 74119-4810
Telephone: (918) 585-2797
Fax: (918) 583-8283
bostonbarristers@tulsacoxmail.com

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| MONTANA GREEN PARTY, DANIELLE BRECK, CHERYL WOLFE, HARRY C. HOVING, DOUG CAMPBELL, STEVE KELLY, ANTONIO MORSETTE, TAMARA R. THOMPSON, and ADRIEN OWEN WAGNER,          Plaintiffs, <br><br> v. <br><br> COREY STAPLETON, in his official capacity as Secretary of State for the State of Montana,          Defendant. | Cause No. CV-18-87-H-BMM-JTJ <br><br> **PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................... ii

INTRODUCTION .................................................... 1

STATEMENT OF THE CASE ....................................... 2

STANDARD OF REVIEW ........................................... 4

ARGUMENT AND AUTHORITIES ................................. 7

I.      Montana's ballot access law challenged herein for recognition of
        new political parties is a severe burden upon the constitutional
        rights of the Plaintiffs herein because of the combined effect of
        the 5,000 petition signature requirement, early deadline, and
        petition distribution requirement in at least 34 State House
        Districts........................................................... 7

II.     Secretary Stapleton incorrectly states the law and facts in the
        U.S. Court of Appeals for the Eighth Circuit's decision in
        Libertarian Party v. Bond.......................................14

CONCLUSION .................................................... 22

CERTIFICATE OF COMPLIANCE ...............................25

CERTIFICATE OF ELECTRONIC SERVICE ...................25

TABLE OF AUTHORITIES

Cases:

American Party of Texas v. White, 415 U.S. 767 (1974) ..............................7,21

Anderson v. Celebrezze, 460 U.S. 780 (1983) …………………………….......6,8,23

Angle v. Miller, 673 F.3d 1122 (9th Cir. 2012) .......................................... 21

Anderson v. Liberty Lobby, Inc. 477 U.S. 242 (1986) ................................  4

Baird v. Davoren, 346 F.Supp 515 (D.Mass. 1972) ....................................22

Blomquist v. Thomson, 739 F.2d 525 (10th Cir. 1984) ............................20,22

Burdick v. Takushi, 504 U.S. 428 (1992) ...............................................  6

Clingman v. Beaver, 544 U.S. 581 (2005) …………………………………...6,9

Communist Party v. State Board of Elections of Illinois,
    518 F.2d 517 (7th Cir. 1975), *cert. den.*, 423 U.S. 986 (1975) .................22

Constitution Party of Pennsylvania v. Cortes, 877 F.3d 480 (3rd Cir. 2017) ......... 14

Dunn v. Blumstein, 405 U.S. 330 (1972) …………………………………......19

Illinois State Board of Elections v. Socialist Workers Party,
    440 U.S. 173 (1979)………………………………………………………18

Kusper v. Pontikes, 414 U.S. 51 (1973) ...............................................18,19

Larson v. State, 2019 MT 28, 434 P.3d 241 (Mont. 2019)………..................12,23

Libertarian Party of Missouri v. Bond, 764 F.2d 538 (8th Cir. 1985) ..............15,21

Libertarian Party of Ohio v. Blackwell, 462 F.3d 579 (6th Cir. 2006) ...............  6

Libertarian Party of Virginia v. Davis, 766 F.2d 865 (4th Cir. 1985) ................. 21

Lubin v. Panish, 415 U.S. 709 (1974) ................................................... 18

McCarthy v. Garrahy, 460 F.Supp. 1042 (D.R.I. 1978) ...................................22

McLain v. Meier, 637 F.2d 1159 (8th Cir. 1980) ........................................21

Moore v. Ogilvie, 394 U.S. 814 (1969) .........................................10,20,22

Norman v. Reed, 502 U.S. 279 (1992) ....................................................  6

Shelton v. Tucker, 364 U.S. 479 (1960) ...............................................19

Socialist Workers Party v. Hare, 304 F.Supp. 534 (E.D. Mich. 1969) ................22

Storer v. Brown, 415 U.S. 724 (1974) .................................................19

Udall v. Bowen, 419 F.Supp. 746 (S.D. Ind.), *aff'd mem.*,
     425 U.S. 947 (1976) ............................................................21

Williams v. Rhodes, 393 U.S. 23 (1968) ...........................................7,18,19

Statutes and Code:

Arizona Rev. Stat. § 16-801..............................................................16

Arizona Rev. Stat. § 16-803..............................................................16

Arizona Rev. Stat. § 16-804 .............................................................16

Mich. Stat. Ann. § 168.685(1) ...........................................................13

Mont. Code Ann. § 13-10-601(2)(b) ....................................................10,12

Mont. Code Ann. §13-10-601(2)(a),(b),(c), and (d) ......................................  2

Neb. Rev. Stat. § 32-716 ................................................................13

N.C. Gen. Stat. § 163A-950(2) ...........................................................13

N.H. Rev. Stat. § 655.42(I) .............................................................13

N.Y. Elec. Law § 6-136(1) ...............................................................13

Ohio Rev. Code § 3517.01(A)(1)(b)(ii) …………………………………13,14

Va. Code Ann. § 24.2-506(A)(1) …………………………………….. 14

Va. Code Ann. § 24.2-543(A) …………………………………… 14

<u>Other Authorities</u>:

Fed. R. Civ. P. 56(c) ……………………………………………….. 4

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

The case at bar concerns the most unique and unusual petition distribution
requirement of any state in the Union.  While most states do not have a
distribution requirement in addition to the total number of signatures required,
Montana is the only state to have a distribution requirement to be gathered from
State House districts rather than congressional districts or limitations on how
many petition signatures can be gathered from certain counties.  Because the
Montana Green Party (hereinafter sometimes referred to as "MGP") appeared to
initially be successful in meeting the Montana petition requirements for party
recognition, the MGP selected candidates for the 2018 general election by
primary.  The origin of the instant case is the fact that there was a highly contested
election involving the re-election effort of Montana U.S. Senator Jon Tester.
Because the MGP nominated Steve Kelly as its candidate for U.S. Senator, the fact
that Mr. Kelly had previously been years before the Democratic candidate for the
lone U.S. Representative seat for Montana, and the perception of many people that
a Green Party candidate for U.S. Senator like Mr. Kelly would hurt Senator
Tester's re-election prospects and help the Republican U.S. Senate candidate, the
Montana Democratic Party and individuals associated with it challenged the

earlier decision of Secretary Stapleton that the MGP had successfully petitioned

for ballot access and political party recognition in Montana for 2018.  The

existence of the 34 House District petition distribution requirement allowed a

detailed and careful investigation into the petition signatures presented for the

MGP which allowed a state court to determine that 87 of the petition signatures

were invalid.  Thus, of the 38 Districts where the MGP had sufficient signatures,

enough invalid petition signatures were found in eight Districts so that the number

of successful Districts was reduced to 30, four below the required number of 34.

In fact, the MGP was only a total of 13 valid petition signatures short of the total

and combined required number in four of the State House Districts.

<div align="center">STATEMENT OF THE CASE</div>

The instant case is a ballot access case on behalf of eight registered Montana

voters and the MGP in regard to what had been an initially successful petition drive

in 2018, to have the Montana Green Party recognized in Montana pursuant to the

requirements of Mont. Code Ann., § 13-10-601(2)(a), (b), (c), and (d), which requires,

along with certain other specific requirements as to the distribution requirement of an

unequal minimum number of petition signatures from at least 34 of the 100 state house

districts, at least 5,000 valid petition signatures of registered Montana voters in order

to form a new political party in Montana.  After being removed from the Montana

ballot by a Montana State Trial Court for insufficient petition signatures in at least

<div align="center">2</div>

34 State House Districts, and as subsequently affirmed by the Montana Supreme Court, the Plaintiffs filed the instant case challenging the constitutionality of the aforesaid ballot access law because of the petition signature deadline and the State House petition distribution requirement.

On September 27, 2019, the Defendant Corey Stapleton, Secretary of State for Montana (hereinafter sometimes referred to as "Secretary Stapleton"), filed a Motion for Summary Judgment, Brief in Support of Motion for Summary Judgment, and Statement of Undisputed Facts in Support of Motion for Summary Judgment (Docs. 41, 42, and 43). Secretary Stapleton's aforesaid Motion for Summary Judgment and supporting pleadings allege that Plaintiffs' lawsuit fails to demonstrate that the petition signature requirements for political party recognition in Montana impose a severe burden because the signature requirement and the distribution requirement and the filing deadline are not severe burdens and there is not an equal protection violation.

In Defendant's Statement of Undisputed Facts in Support of his Motion for Summary Judgment (Doc. 43), Secretary Stapleton set forth a statement of 56 undisputed facts. As set forth in Plaintiffs' separately filed Statement of Disputed Facts in opposition to Defendant's motion for summary judgment, one of the facts set forth in Secretary Stapleton's Statement of Undisputed Facts (No. 17) is immaterial and partly disputed by Plaintiffs while the remaining 55 undisputed

facts in Secretary Stapleton's aforesaid Statement of Undisputed Facts, while admitted by Plaintiffs, are insufficient alone to justify summary judgment for Secretary Stapleton.  Plaintiffs now submit their Brief in Opposition to Defendant's Motion for Summary Judgment.

## STANDARD OF REVIEW

There is no question as to the appropriate standard for a District Court to apply in deciding a motion for summary judgment.  The District Court should ". . . grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); also see Fed. R. Civ. P. 56(c). However, the District Court should remember ". . . at the summary judgment stage, the Judge's function is not himself to weight the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249.  In essence, the inquiry for the District Court is ". . . whether there is the need for a trial . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250.  In reviewing the evidence and record supporting and opposing the summary judgment motion, the trial court must view all facts and inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.

In considering the standard of review in judging a motion for summary judgment, and applying it to the instant case, it should be remembered that a ballot access case requires the use of a standard of review which weights the effects of the election law challenged.  The United States Supreme Court has held in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) what the standard is to be used in determining whether election laws are unconstitutionally oppressive of potential voters' rights.  The Supreme Court held that such constitutional challenges to specific provisions of a state's election laws cannot be resolved by any litmus-paper test that will separate valid from invalid restrictions, but rather that the Trial Court ". . . must resolve such a challenge by an analytical process that parallels its work in ordinary litigation." *Anderson v. Celebrezze*, 460 U.S. at 789.  In a three-prong balancing test, the U.S. Supreme Court stated that the Trial Court must

> . . . first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interest put forth by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. *Anderson v. Celebrezze,* 460 U.S. at 789.

Under this test, the trial court must apply a level of scrutiny which varies on a sliding scale with the extent of the asserted injury to Plaintiffs' constitutional rights. When, at the low end of that scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, the 'State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. at 788, 788-789 n.9. But when the law places "severe" burdens on the rights of political parties, candidates or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). In fact, ". . . because the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decisionmaking may warrant more careful judicial scrutiny." *Anderson v. Celebrezze*, 460 U.S., at 793, n. 16. After all, "the State may not be a 'wholly independent or neutral arbiter' as it is controlled by the political parties in power, 'which presumably have an incentive to shape the rules of the electoral game to their own benefit.'" *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 587 (6th Cir. 2006) (quoting from *Clingman v. Beaver*, 544 U.S. 581 (2005) (O'Conner, J., concurring). Since this case involves election laws that burden a minor political party, and the corresponding constitutional right of individuals to

6

political expression and association, the appropriate standard of review which should be required for this Court is strict scrutiny, so that state laws cannot stand unless they "further compelling state interests . . . that cannot be served equally well in significantly less burdensome ways." *American Party of Texas v. White*, 415 U.S. 767, at 780-781 (1974).

Montana's challenged election laws for political party formation burden the rights of individuals supporting the formation of a new political party in "two different, although overlapping kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.  Both of these rights, of course, rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

## ARGUMENT AND AUTHORITIES

I.    Montana's ballot access law challenged herein for recognition of new political parties is a severe burden upon the constitutional rights of the Plaintiffs herein because of the combined effect of the 5,000 petition signature requirement, early deadline, and petition distribution requirement in at least 34 State House Districts.

The Montana Green Party was the only minor political party to obtain recognition for ballot status by petitioning in Montana for the 2018 election cycle, and then be derecognized by action of State Courts in applying the state house district petition distribution requirement. While Montana's petition requirements

for new political parties has been complied with in the past, none of those parties ever had a decision of the Secretary of State admitting the adequacy of their petition signatures challenged in such a detailed and extreme way as was done here with the MGP. Also, the fact that other political parties had been able to comply with the law does not prevent successful challenges by other parties and candidates. *Anderson v. Celebrezze*, *Id.* It is the State House distribution requirement that makes Montana's ballot access law for new political party recognition severe. For a good explanation of the difficulty caused by the law, see, Doc. 42-1, Defendant's Exhibit C, deposition of Danielle Breck, p. 48, line 6-p. 51, line 20).

While Secretary Stapleton tries to defend the petition signature requirement, filing deadline, and 34 State House Districts distribution requirement separately, the instant action challenges petition signature requirements for the formation of a new political party in Montana based on the "combined effect" of a petition deadline almost three months before the primary election, the 5,000 petition signature requirement, and—especially—the petition signature distribution requirement of at least sufficient petition signatures to equal or exceed 5% of the vote cast for the winning candidate for Montana governor in the previous election in each of at least 34 State House Districts. Plaintiffs are asking for declaratory relief as to the unconstitutionality of the "combined" aforesaid election laws along

8

with injunctive relief as to future enforcement and recognition of the Montana

Green party as a political party in the next election cycle. While the petition

signature deadline is rather early, and the number of petition signatures required

relatively high compared to other states, these requirements taken individually are

not unconstitutional in and of themselves. However, when put together and then

considered with the distribution requirement requiring an unequal number of

petition signatures in the State House Districts, the law is unconstitutional both

facially and as applied in its combined effect.

> A panoply of regulations, each apparently defensible when considered
> alone, may nevertheless have the combined effect of severely restricting
> participation in competition. Even if each part of a regulatory regime
> might be upheld if challenged separately, one or another of these parts
> might have to fall if the overall scheme unreasonably curtails associational
> freedoms. *Clingman v. Beaver*, 544 U.S. at 607-608 (O'Conner, J.,
> concurring).

It simply makes no sense for the distribution requirement to be based on votes for

the winning gubernatorial candidate in each of at least 34 State House Districts.

Secretary Stapleton never explains why some State House districts should have a

petition signature requirement either almost three times greater or one third the

number required of other districts. Because the distribution requirement varies

widely from 55 to 150 petition signatures per district, discriminates against petition

signers in State House Districts where the winning candidate for governor received

a higher percentage of the vote, because there is no distribution requirement for a

9

statewide independent candidate petition, and because the challenged laws could and did prevent ballot access for a political party that achieved significantly more than the 5,000 petition signatures required statewide, the challenged election laws are unconstitutional as a violation of the equal protection clause and the principle of one-person, one-vote.  As the U.S. Supreme Court has stated, it is no justification that a new political party must have a fairly broad base of support since that justification was specifically rejected in *Moore v. Ogilvie*, 394 U.S. 814 (1969).  "It is no answer to the argument under the Equal Protection Clause that this law was designed to require statewide support for launching a new political party rather than support from a few localities."  *Moore v. Ogilvie,* 394 U.S. at 818.

In regard to the petition drive to place the MGP on the ballot in Montana in 2018 as a recognized political party, by March 5, 2018, the MGP's supporters had turned in a total of 10,160 petition signatures for the recognition of the MGP, pursuant to Mont. Code Ann., § 13-10-601(2) (b), of which 7,386 were verified by various State election officials as valid Montana registered voters.  These petition signatures were collected from 47 of the 100 State House Districts in Montana.  Initially there were sufficient petition signatures collected in 38 of the State House Districts to comply with the 34 State House Districts distribution requirement.  Therefore, the MGP had more than the 5,000 petition signatures required by law and more than the required number of signatures needed under the distribution requirement for the minimum requirement

10

5% of the previous vote for the winning candidate in at least 34 of the 100 State House Districts.

However, following legal action by three Montana electors and the Montana Democratic Party in state court, which named the Secretary of State as the defendant and the Montana Green Party as an interested party, on July 9, 2018, a State Court Judge found that a total of 87 petition signatures in eight of the State House Districts were invalid for various reasons. The state court invalidated a number of signatures from House Districts 20, 21, 43, 54, 56, 80, 83, and 84, for a number of reasons as to irregularities. The state district court concluded that in House Districts 20, 21, 43, 54, 56, 80, 83, and 84, the numbers of required petition signatures were, respectively, 140, 135, 105, 130, 101, 132, 150, and 150--even though the population of all these State House Districts was approximately the same according to the 2010 census in Montana, while the number of valid petition signatures in the aforesaid eight House Districts were, respectively, 138, 128, 103, 127, 95, 125, 144, and 140. The state court's invalidation of signatures from these districts resulted in the Montana Green Party not qualifying in the required minimum of 34 House Districts, but only having sufficient petition signatures under the Montana distribution requirement so as to qualify in 30 State House districts, rather than the 38 State House districts the MGP had had previously. However, the issue of the constitutionality of the Montana petition distribution

11

requirement was not at issue and was neither briefed nor argued in the state case. *Larson v. State*, 2019 MT 28, 434 P.3d 241 (Mont. 2019). The Montana Green Party was therefore removed from the election ballot even though there were still 7,299 valid petition signatures statewide and only a total of about 87 petition signatures had actually been invalidated. Therefore, under current state law, the Montana Green Party was four State House Districts short of the 34 State House Districts required under the petition distribution requirement of Mont. Code Ann. § 13-10-601(2)(b) and denied political party recognition even though the Montana Green Party had previously participated in the nomination of candidates in the primary election.

The distribution requirement as to petition signatures requires that a new political party seeking state recognition obtain not just 5,000 petition signatures, but also petition signatures of at least 5% of the winning candidate's vote for governor in at least 34 of the State House Districts. Since the law caps the number of signatures required in a State House District at no more than 150, the current requirement varies from one State House District to another from a low of 55 petition signatures to the aforesaid high of 150 petition signatures, thus violating equal protection and the constitutional principle of one-person, one-vote. The 150 petition signature cap currently exists for 26 State House Districts, with 53 State House Districts having a requirement of between 100 and 140 petition signatures, and the remaining 21 State

House Districts having a petition signature requirement of between 55 and 95 petition signatures.

The uniqueness of Montana's distribution requirement is shown by the fact that only a few states have a distribution requirement spread over a designated number of congressional districts—with all of them setting petition signature requirements from each district on an equal signature requirement.  Nine states, including Montana, have distribution requirements for either a statewide independent petition, or a petition to create a new party.  Except for Montana and Arizona, all the other such states use U.S. House districts instead of state legislative districts:  (1) Michigan requires 100 signatures in each of half the districts, which currently means seven districts, Mich. Stat. Ann. §168.685(1); (2) Nebraska's party petition requires 1% of the last gubernatorial vote in each of its three U.S. House districts, Neb. Rev. Stat. § 32-716; (3) New Hampshire's party petition has no distribution requirement, but its statewide independent petition requires 1,500 signatures from each of its two U.S. House districts, N.H. Rev. Stat. § 655.42(I); (4) New York requires 100 signatures from each of half its U.S. House districts, which currently means 14 districts, N.Y. Elec. Law § 6-136(1); (5) North Carolina's party petition requires 200 signatures from three U.S. House districts, N.C. Gen. Stat. § 163A-950(2); (6) Ohio requires 500 signatures in half its U.S. House districts, which now means eight districts, Ohio Rev. Code §

13

3517.01(A)(1)(b)(ii); (7) Virginia requires 200 signatures in each of its eleven districts, for minor party and independent presidential petitions, and other statewide petitions need 400 in each U.S. House District, Va. Code Ann. §§ 24.2-543(A) and 24.2-506(A)(1).  "[C]ongressional districts must have populations that are 'as nearly as practical' equal in population; thus, requiring a minimum number of signatures to be gathered from different congressional districts serves the interest of requiring candidates to show support across different geographical areas but does not dilute anyone's voting power."  *Constitution Party of Pennsylvania v. Cortes*, 877 F.3d 480, 485 (3rd Cir. 2017).

II.     Secretary Stapleton incorrectly states the law and facts in the U.S. Court of Appeals for the Eighth Circuit's decision in Libertarian Party v. Bond.

There are no states that have a comparable distribution requirement for petition signatures like Montana's law challenged herein.  As set forth hereinabove, seven states have distribution requirements for some or all of their Congressional Districts—although with an equal number of signatures required from each District.  Because of the uniqueness of Montana's distribution requirement, Secretary Stapleton presents the Eighth Circuit decision in *Libertarian Party of Missouri v. Bond*, 764 F.2d 538 (8th Cir. 1985), for what is argued is a law "more akin" to Montana's law.  In this assertion, Secretary Stapleton is absolutely wrong.  On page 31 of his Brief, Secretary Stapleton states

14

that ". . . the Missouri law provided that minor parties could gain ballot access by presenting a petition signed by 2% of the number of votes cast for the last successful governor in half of the congressional districts." Actually, the foregoing statement is an incorrect statement of what was required in Missouri for a formerly existing law because, unlike Montana, the percentage was applied to the total vote cast in each congressional district for governor ("votes for governor"), not the winning candidate for governor. *Libertarian Party of Missouri v. Bond*, 564 F.2d at 544. It is for this reason that the Eighth Circuit in *Libertarian Party of Missouri v. Bond* stated that the percentage of votes cast was a reasonable means to measure how many petition signers were in each district and that it was a better measurement of potential petition signers than the population of the district. The foregoing mistake in the brief of Secretary Stapleton undergirds a significant distinction between the case at bar and the situation in Missouri. Additionally, it should be pointed out that a congressional district in Missouri is not only considerably larger than a State House district in Montana, but the situation in Missouri in the *Libertarian Party v. Bond* case required that the petition signatures be gathered in far fewer districts (five out of nine) than are required today in Montana (34 out of 100). Therefore, while Missouri had an equal requirement based on the total number of people in each Congressional District who had voted for governor, Montana has a significantly varying requirement from 55 to 150

15

petition signatures in its State House districts so as not to be representative in the same way as Missouri as to the available people likely to sign petitions.

Other than the aforesaid seven states which use congressional districts, and Montana which uses State House districts, the distribution requirement for Arizona requires petition signatures for the formation of a new political party to be gathered from at least five of Arizona's 15 counties—although there is no minimum number of petition signatures required from each of the five counties.  Also, no more than 90 percent of the petition signatures may come from counties that have a population of at least half a million people or more (Maricopa and Pima).  Finally, at least 10% of the total petition signatures required must be gathered from the 13 Arizona counties which have a population of less than 500,000 people.  The total number of petition signatures which is currently required in Arizona is 31,686, which represents 1 1/3 percent of the total vote case in the last gubernatorial election in Arizona.  (Arizona Rev. Stat. §§ 16-801, 16-803, and 16-804).  Of course, if a distribution requirement like Arizona's was in effect in Montana, the MGP would easily have met the distribution requirement in 2018.

Even though each state house district has approximately the same population, the signature requirement in the various state house districts varies from a low of 55 petition signatures to a high of 150 petition signatures depending on how many people in that district voted for the last winning gubernatorial

candidate.  Thus, the disparity in petition signatures required is almost three times as great from the lowest requirement to the highest.  No other state has this particular difference in the number of signatures required.    Montana also requires signatures from many more districts than any other state.  No other state requires in-district signatures from more than fourteen districts or requires a different number of signatures from its districts.  Unlike all other states which have a petition distribution requirement, Montana is unique in that the percentage within the district for the district distribution requirement is a higher percentage than required for the statewide petition. Also, Montana is the only state in which the in-district requirement is greater than 1% of the last vote cast.

But for the State House District distribution requirement, the Montana Green Party would have had more than enough petition signatures for political party recognition in Montana in 2018.   In the current election cycle for Montana, the deadline to submit new political party qualification petitions to county election administrators is March 2, 2020 (i.e., 92 days before the statewide primary election); the deadline for the Secretary of State to receive verified new political party qualification petitions from county election administrators is March 9, 2020 (i.e., 85 days before the statewide primary election); the Montana statewide primary election date is June 2, 2020; and the Montana general election is November 3, 2020.

It is undisputed that restrictions on access to the election ballot burden two distinct and fundamental rights, ". . . the right of individuals to associate for the advancement of political beliefs, the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). "The freedom to associate as a political party, a right we have recognized as fundamental [*Williams v. Rhodes*, 393 U.S. at 30-31], has diminished practical value if the party can be kept off the ballot. Access restrictions also implicate the right to vote because, absent recourse to referendums, 'Voters can assert their preferences only through candidates or parties or both,' *Lubin v. Panish*, 415 U.S. 709, 716 (1974); "*Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, at 814 (1979).

When these fundamental, constitutionally protected rights are unreasonably or unfairly limited or denied, relief is available to set aside restrictions or denial in an action such as the instant case. The teaching of the U. S. Supreme Court is that:

> "even when pursuing a legitimate interest, a state may not choose means that **unnecessarily restrict** constitutionally protected liberty," *Kusper v. Pontikes*, 414 U.S. 51 (1973), and we have required that states adopt the **least drastic means** to achieve their end. *Lubin v. Panish*, 415 U.S. at 716. . .; *Williams v. Rhodes*, 393 U.S. at 31-33 . . .. **This requirement is particularly important where restrictions on access to the ballot are involved**. The state's interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the development of the nation. [Emphasis added] *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. at 185.

"As our past decisions have made clear, the significant encroachment upon associational freedom cannot be justified upon a mere showing of a legitimate state interest [citations omitted]. If the State has open to it a least drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental liberties. *Shelton v. Tucker*, 364 U.S. 479 [1960]." *Kusper v. Pontikes*, 414 U.S. at 58-59. In deciding what the "least drastic or restrictive means," is, it is necessary for the Court to ". . . consider the facts and circumstances behind the law, the interest which the state claims to be protecting, and the interests of those who are disadvantaged by the classification." *Storer v. Brown*, 415 U.S. 424, at 730 (1974), citing *Williams v. Rhodes, Id.*, and *Dunn v. Blumstein*, 405 U.S. 330 (1974). Secretary Stapleton has shown no compelling State interest for the unequal petition signature distribution requirement for at least 34 State House districts.

Montana has an early petition deadline (almost three months before Montana's primary election), coupled with the relatively high petition signature requirement, and the unequal petition distribution requirement in at least 34 State House Districts. These requirements when considered together are unconstitutional lack any compelling interest, and unequally and unfairly impact in a discriminatory manner the right of small, minor, unrecognized political parties in Montana who have collected more than the required number of 5,000 petition

signatures for party formation in Montana.  *Moore v. Ogilvie,* 394 U.S. at 819 ("It

is no answer to the argument under the Equal Protection Clause that this law was

designed to require statewide support for launching a new political party rather

than support from a few localities." *Moore v. Ogilvie*, 394 U.S. at 818); and

*Blomquist v. Thomson*, 739 F.2d 525, 527-528 (10th Cir. 1984) (declaring

unconstitutional a Wyoming ballot access law involving a petition distribution

requirement which stated that the majority of the 8,000 petition signatures required

for a new political party's recognition could not be of Wyoming voters who

resided in the same county).  Montana's petition signature distribution requirement

gives disproportionate influence to voters in State House Districts who least

supported the previous winning candidate for Montana governor and diminished

influence to voters in State House Districts who most supported the winning

candidate for governor.  Further, while Montana might argue it had a rational

interest in ensuring reasonable widespread support in a petition signature drive for

new political party recognition, the actual effect of the petition signature

distribution requirement was to result in 53 of the 100 State House districts being

ignored.  Particularly the Court should consider that it is the unequal signature

requirement in at least 34 State House Districts for petitioning that makes the law

unconstitutional under the principle of one-person, one-vote because it is based on

an unequal signature requirement in State House Districts of approximately the

same population.  This would not be so if it were based on Congressional Districts

where the signature requirement was the same.  See, e.g., *Angle v. Miller*, 673 F.3d

1122, 1129 (9th Cir. 2012); *Libertarian Party v. Bond, Id*; *Libertarian Party of*

*Virginia v. Davis*, 766 F.2d 865, 868 (4th Cir. 1985); *Udall v. Bowen*, 419 F.Supp.

746, 748-749 (S.D. Ind.), *aff'd mem.*, 425 U.S. 947 (1976).  However, it is much

easier figuring out what congressional district a petition signer is in as compared to

a State House district in Montana.  Individual voters may know what town or

county or even congressional district they are in, but State House districts are

another matter.

While Montana's early petition deadline and signature requirement are

relatively severe compared to other states, the Supreme Court has spoken on at

least one occasion of 1% of the vote for governor as "within the outer boundaries

of support the State may require before according political parties ballot position."

*American Party of Texas v. White*, 415 U.S. 767, at 783 (1974). See also, *McLain*

*v. Meier*, 637 F.2d 1159, 1163-1164 (8th Cir. 1980).  It is the "combined effect" of

the State House distribution requirement using an unequal number of signatures

which renders the Montana law in question without any justifiable basis that would

serve any compelling state interest that would make constitutional sense.

The Plaintiffs were able to have sufficient statewide signatures for political

party recognition in Montana, but had their State House district distribution

signatures reduced from 38 State House Districts (where they had the requisite number of signatures) to 30 State House Districts—which was four short of the 34 required. This result is because there is an unequal requirement for the number of signatures required in the requisite 34 State House Districts so as to violate Plaintiffs' equal protection rights under the Fourteenth Amendment and the Constitutional principle of one-person, one-vote, and because said requirements give greater weight to the votes of some citizens and, thereby, cause inequality in voting power. *Moore v. Ogilvie, Id.*; *Communist Party v. State Board of Elections of Illinois*, 518 F.2d 517 (7th Cir. 1975), *cert. den.*, 423 U.S. 986 (1975); also see *Blomquist v. Thomson, Id.*; *McCarthy v. Garrahy*, 460 F.Supp. 1042, 1046 (D.R.I. 1978); *Baird v. Davoren*, 346 F.Supp. 515 (D.Mass. 1972); and *Socialist Workers Party v. Hare*, 304 F.Supp. 534 (E.D. Mich. 1969). Montana's State House District distribution requirement discriminates against the State House districts which gave a larger vote to the previous winning candidate for governor as opposed to the State House districts which gave a lesser vote to the winning candidate for governor. There is no compelling state interest for such a requirement. No other state has tried a distribution plan similar to Montana's unequal signature requirement for State House districts.

## CONCLUSION

The effect of the election laws challenged herein has resulted in the removal

22

of a political party from the Montana ballot and the elimination of political choice

for the MGP's supporters and Montana voters in general.   While the MGP more

than met the petition signature requirement statewide, a clearly unconstitutional

political party distribution requirement resulted in the MGP being excluded from

the ballot after the disqualification of only 87 petition signatures.  *Larson v. State,*

*Id.*   In fact, when one looks at the deficit in only four of the eight State House

Districts (viz.: Districts 20, 43, 54, and either 56 or 83 (in which the MGP dropped

below the number of petition signatures required, it can be seen that the petition

signature deficit was a mere 13 petition signatures.  (This is particularly made clear

by looking at the charts in the opinion in the Supreme Court of Montana in *Larson*

*v. State*, 434 P.3d at 250-251.  As the United States Supreme Court has stated in

regard to ballot access laws:

> A burden that falls unequally on new or small political parties or on
> independent candidates impinges, by its very nature, on associational
> choices protected by the First Amendment.  It discriminates against those
> candidates and—of particular importance—against those voters whose
> political preferences lie outside the existing political parties [citation
> omitted]. By limiting the opportunities of independent-minded voters to
> associate in the electoral arena to enhance their political effectiveness as a
> group, such restrictions threaten to reduce diversity in competition in the
> marketplace of ideas. *Anderson v. Celebrezze*, 460 U.S. at 793-794.

WHEREFORE, premises considered, Plaintiffs respectfully request the

Court deny Defendant's motion for summary judgment, grant Plaintiffs' motion for

summary judgment, declare the laws in question unconstitutional, issue an

23

injunction barring their enforcement, and placing the Montana Green Party on the

Montana ballot for the next election cycle.

Respectfully submitted this 18th day of October, 2019.

<div style="margin-left: 40%;">

/s/ James C. Linger
James C. Linger, OBA#5441
1710 South Boston Avenue
Tulsa, OK 74119-4810
Telephone: (918) 585-2797
Facsimile: (918) 583-8283
bostonbarristers@tulsacoxmail.com

Quentin M. Rhoades
State Bar No. 3969
Kristin Bannigan
State Bar No. 36435405
RHOADES SIEFERT & ERICKSON, P.L.L.C.
430 North Ryman
Missoula, Montana 59802
Telephone: (406) 721-9700
Telefax: (406) 728-5838
qmr@montanalawyer.com

*Counsel for Plaintiffs*

</div>

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d) (2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 5,729 words, excluding caption, certificates of service and compliance, table of contents and authorities, and exhibit index.

/s/ James C. Linger
James C. Linger
Counsel for Plaintiffs


## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that a true and exact copy of the foregoing has been served on all counsel of record via the Court's CM/ECF e-mail notification system on the 18th day of October, 2019.

/s/ James C. Linger
James C. Linger