## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| MONTANA GREEN PARTY, DANIELLE BRECK, CHERYL WOLFE, HARRY C. HOVING, DOUG CAMPBELL, STEVE KELLY, ANTONIO MORSETTE TAMARA R. THOMPSON, and ADRIEN OWEN WAGNER, <br><br> Plaintiffs, <br><br> vs. <br><br> COREY STAPLETON, in his official capacity as Secretary of State for the State of Montana, <br><br> Defendant. | CV 18-87-H-BMM-JTJ <br><br> **FINDINGS AND RECOMMENDATIONS** |

## INTRODUCTION

Plaintiffs, the Montana Green Party and eight registered Montana voters, have brought this action against Montana's Secretary of State, Corey Stapleton (Stapleton). Plaintiffs challenge the constitutionality of a signature requirement that a minor political party must satisfy in order to be placed on the primary election ballot. Plaintiffs allege that Montana's signature requirement for individual legislative districts violates the First and Fourteenth Amendments of the United States Constitution. Plaintiffs request that the Court declare the signature

requirement for individual legislative districts unconstitutional, and enjoin its enforcement.

The parties have filed cross-motions for summary judgment together with a Joint Statement of Undisputed Facts. The parties agree that no genuine issues of material fact exist with respect to the claims asserted. The motions have been referred to the undersigned under 28 U.S.C. § 636(b)(1)(B) for findings and recommendations. (Doc. 31). The Court has conducted a hearing on the motions. The Court is prepared to enter its findings and recommendations.

## BACKGROUND

### a.    Montana's Legislative Districts

Montana has 100 legislative districts. The boundaries for the legislative districts were established after the 2010 census. The legislative districts are approximately equal in population. (Doc. 61 at 4).

### b.    Montana's Two-Tiered Ballot Access Scheme

Montana has created a two-tiered ballot access scheme for minor political parties seeking to be placed on the primary election ballot. A minor political party will appear automatically on the ballot if the party had a candidate for a statewide office in either of the last two general elections who received a total vote equaling

5% of more of the total votes cast for the successful gubernatorial candidate. Mont. Code Ann. § 13-10-601(1).

Alternatively, a minor political party may appear on the primary ballot if it submits a petition signed by registered voters that complies with the petition program described in Mont. Code Ann. § 13-10-601(2).

### c.   Montana's Petition Program

Montana's petition program includes a statewide signature requirement, a signature requirement for individual legislative districts (a per-district signature requirement), and a filing deadline.  Mont. Code Ann. § 13-10-601(2).

The statewide signature requirement requires that the petition must be signed by a number of registered voters equal to 5% or more of the total votes cast for the successful gubernatorial candidate in the last election or 5,000 registered voters, whichever is less.  Mont. Code Ann. § 13-10-601(2)(b).

The per-district signature requirement requires that the petition must be signed by registered voters in at least 34 of Montana's 100 legislative districts. The per-district signature requirement further requires that in at least 34 legislative districts the number of signatures collected must equal 5% or more of the total votes cast for the successful gubernatorial candidate in the last election in that

district, or 150 signatures in that district, whichever is less.  Mont. Code Ann.

§ 13-10-601(2)(b).

Montana's petition program also requires that the signed petition must be

presented to the appropriate election administrator along with the circulation

affidavits, no later than 92 days before the date of the primary election.  Mont.

Code Ann. § 13-10-601(2)(c)-(d).

When the election administrators receive the petition sheets and circulation

affidavits they must "verif[y]" the submitted signatures.  Mont. Code Ann. § 13-

10-601(2)(c).  The county administrators must then forward the "verified petition"

sheets and attached circulation affidavits to the Secretary of State at least 85 days

before the date of the primary election.  Mont. Code Ann. § 13-10-601(2)(d).

When the Secretary of State receives the petition sheets and circulation

affidavits, the Secretary of State must "consider and tabulate" the verified petition

signatures and then, upon determining that the petition includes the requisite

numbers of verified signatures, certify the subject political party as eligible for

placement on the primary ballot.  Mont. Code Ann. § 13-27-307.

### d.    <u>The Election in 2018</u>

In 2018, the statewide primary election date was June 5, 2018, and the

statewide general election date was November 6, 2018.  Two Montana Green Party

leaders (Danielle and Thomas Breck) began gathering signatures in 2017 to

qualify the Montana Green Party for the 2018 election ballots under Mont. Code

Ann. § 13-10-601. The deadline to submit signed qualification petitions and

affidavits to the county election administrator was March 5, 2018. The Brecks had

submitted only 699 signatures as of March 5, 2018. However, to their surprise, in

the final three weeks before the March 5th deadline, Advanced Micro Targeting, a

Nevada political consulting firm, had independently collected an additional 9,461

signatures from four counties (Cascade, Lewis and Clark, Missoula and

Yellowstone) in support of the Montana Green Party's petition. *Larson v.*

*Montana*, 434 P.3d 241, 248 (Mont. 2019). Through the combined efforts of the

Brecks and the Advanced Micro Targeting, the Montana Green obtained a total of

10,160 statewide signatures from 47 of Montana's 100 legislative districts.

County election administrators verified 7,386 of the signatures submitted by

the Montana Green Party. The county election administrators forwarded the

verified petition sheets and attached circulation affidavits to the Secretary of State

for his review. The Secretary of State determined that the verified signatures

satisfied both the statewide signature requirement and the per-district signature

requirement in 38 legislative districts. Based on this finding, the Secretary of

State certified the Montana Green Party for placement on the primary election ballot. *Larson*, 434 P.3d at 248.

Shortly after the Secretary of State made his determination, a plaintiff group filed a lawsuit in the Montana First Judicial District Court, Lewis and Clark County, challenging the Secretary of State's certification of the Montana Green Party. The lawsuit named the Secretary of State as the defendant and the Montana Green Party as an interested party. The plaintiff group argued that the Secretary of State's certification of the Montana Green Party should be set aside because a number of the signatures submitted by the Montana Green Party were invalid.

The state district court agreed with the plaintiff group. The court determined that 87 of the signatures submitted by the Montana Green party were invalid. The court found the signatures to be invalid for a variety of reasons. The court ruled that:

> 1.   36 petition signatures from 6 legislative districts were invalid because the signature gather had submitted false affidavits attesting that he had personally gathered the signatures;
>
> 2.   31 petition signatures from 8 legislative districts were invalid because they did not match the corresponding signatures on the voter registration cards;

3.     6 petition signatures from 3 legislative districts
       were invalid because they were matched to the
       wrong registered voter;

4.     9 petition signatures from 4 legislative districts
       were invalid because they were not associated
       with correct or correctly altered signing dates; and

5.     5 petition signatures from 4 legislative districts
       were invalid because they did not include a printed
       name.

*Larson*, 434 P.3d at 250.  The state court's nullification of the 87 signatures had a

significant adverse impact on the Montana Green Party.  The Montana Green Party

no longer possessed enough valid signatures to satisfy the per-district signature

requirement in the minium 34 legislative districts, as required under Mont. Code

Ann. § 13-10-601(2)(b).  The Montana Green Party could only meet the per-

district signature requirement in 30 legislative districts.  *Id*.

Given this shortfall, the state district court enjoined the Secretary of State

from giving effect to his prior certification of the Montana Green Party, and the

court directed the Secretary of State to remove the Montana Green Party from

Montana's 2018 primary election ballot.  *Id*.

The Secretary of State and the Montana Green Party filed cross-appeals with

the Montana Supreme Court.  The Montana Green Party later moved to dismiss its

appeal.  The Montana Green Party filed the present action while its motion to

dismiss was pending before the Montana Supreme Court.  The Montana Supreme

Court affirmed the decision of the state district court on August 21, 2018.  *Larson*,

434 P.3d at 268.

     e.     **Present Lawsuit**

The present lawsuit challenges the constitutionality of Montana's signature

requirement for individual legislative districts.  Plaintiffs concede that both

Montana's statewide signature requirement and Montana's petition signature

deadline, pass constitutional muster.  Plaintiffs specifically state:

> "While the petition signature deadline is rather early, and
> the number of [state-wide] petition signatures required
> [is] relatively high compared to other states, these
> requirements individually are not unconstitutional."

(Doc. 38 at 30-31).

Plaintiffs argue, however, that Montana's signature requirement for

individual legislative districts violates the First and Fourteenth Amendments to the

United States Constitution.  Plaintiffs argue that the per-district signature

requirement violates the First Amendment because the signature requirement

creates a severe burden on the rights of Montana citizens to associate politically

and to cast votes effectively that cannot be justified on grounds it serves a

compelling state interest.

Plaintiffs argue that Montana's per-district signature requirement violates the Fourteenth Amendment because it allocates unequal power to the registered voters of equally populated legislative districts.

## DISCUSSION

### A.     Plaintiffs' Challenge Under the First Amendment

#### a.     The Two-Pronged Analysis

Ballot access laws that restrict a political party's access to an election ballot trigger two fundamental First Amendment rights: the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters to cast their votes effectively. *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). These rights are not absolute, however. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). States may enact ballot access laws that restrict a minor political party's access to the ballot so long as the restrictions do not violate the Constitution. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 452 (2008).

Courts undertake a two-pronged analysis to determine whether a ballot access law violates the First Amendment. *Burdick*, 504 U.S. at 434. Courts first determine the "character and magnitude" of the burden that the election law imposes on the plaintiffs' First Amendment rights. *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008). The court determines whether the ballot access law

imposes a severe or discriminatory restriction on the plaintiffs' constitutional rights, or a reasonable, non-discriminatory restriction. *Id.*

Under the Second Prong of the analysis, the court identifies and evaluates the State's justification for the ballot access law.   Election laws that impose a severe or discriminatory restriction on the plaintiffs' constitutional rights are "subject to strict scrutiny and will be upheld only [if they] are narrowly tailored to serve a compelling state interest." *Nader*, 531 F.3d at 1035.  Election laws that impose "reasonable, nondiscriminatory restrictions," are subject to less scrutiny and will be upheld if they are justified by the State's "important regulatory interests." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); see also, *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015). The Ninth Circuit Court of Appeals has described this approach as a "sliding scale" approach: "the more severe the burden imposed, the more exacting [the] scrutiny; the less severe, the more relaxed [the] scrutiny." *Arizona Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019).

**b.**   **Nature and Severity othe Restriction**

A signature requirement qualifies as a severe restriction if it shown that the requirement would, in most instances, prevent a "reasonably diligent" minor

political party from obtaining a place on the ballot.  See *Nader*, 531 F.3d at 1035;

*Arizona Libertarian Party v. Reagan*, 798 F.3d at 730.

Here, the undisputed facts show that Montana's signature requirement for

individual legislative districts does not impose a severe burden on a minor

political party seeking to gain access to an election ballot.  Montana enacted the

per-district signature requirement in 1981.  Minor political parties have

successfully completed Montana's per-district signature requirement eight times

since 1981: the Libertarian party qualified for the ballot in 1982; 2) the Natural

Law Party qualified for the ballot in 1996; 3) the Reform Party qualified for the

ballot in 1996; 4) the Constitution party qualified for the ballot in 2000, 2002,

2004 and 2006; and 5) the Americans Elect Party qualified for the ballot in 2012.

No evidence has been presented of even a single instance where a minor

political party was unable to collect enough signatures to satisfy Montana's per-

district signature requirement.  In 2018, the Montana Green Party collected

enough signatures to satisfy the per-district signature requirement in 38 legislative

districts.  The Montana Green Party would have qualified for placement on the

ballot if its signature gathers would have complied with Montana's signature

gathering requirements.

For these reasons, the Court must conclude that the burden imposed by

Montana's signature requirement for individual legislative districts is reasonable

and not severe.

### c.   Montana's Justification for its Signature Requirement

Having determined that Montana's per-district signature requirement is

reasonable and not severe, the Court must now determine whether the signature

requirement is designed to serve "important regulatory interests." *Arizona*

*Libertarian Party v. Reagan*, 798 F.3d at 730.  The court must consider:

1.   "[T]he precise interests put forward by the State as
     justifications for the burden imposed by its
     [signature requirement];"

2.   "[T]he legitimacy and strength of each of those
     interests;" and

3.   "[T]he extent to which those interests make it
     necessary to burden the plaintiff[s]'
     [constitutional] rights.

*Anderson*, 460 U.S. at 789.

Montana's signature requirement for individual legislative districts is

designed to serve a number of important state interests.  Montana, like every other

state, has a right to require that minor political parties demonstrate a modicum of

support in order to qualify for placement on the ballot.  *Munro v. Socialist*

-12-

*Workers Party*, 479 U.S. 189, 193 (1986); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Montana's signature requirement for individual legislative districts undeniably accomplishes this interest by directly measuring a minor political party's level of support. It ensures that only bona fide candidates with a measure of support gain access to the ballot. See *Hobbs* 925 F.3d at 1094; *Swanson v. Worley*, 490 F.3d 894, 911 (11th Cir. 2007). Montana's per-district signature requirement also prevents voter confusion and ballot overcrowding. *Id.*

Montana's important state interest of requiring that each political party on the ballot have a modicum of support is sufficient to justify the burden imposed by Montana's signature requirement for individual legislative districts. *Hobbs* 925 F.3d at 1093-1094. The Court must therefore conclude that Montana's signature requirement for individual legislative districts does not violate the First Amendment.

## B. **Plaintiffs' Challenge Under the Fourteenth Amendment**

As discussed above, Montana's signature requirement for individual legislative districts requires a minor political party to collect signatures in each district in an amount equal to 5% or more of the total votes cast for the successful gubernatorial candidate in the last election in that district, or 150 signatures in that district, whichever is less. Mont. Code Ann. § 13-10-601(2)(b). The number of

signatures that a minor political party must collect in each district may vary from district to district because the signature amount in each district is dependent upon the number of voters in that district that voted for the successful gubernatorial candidate in the previous election.  If the size of the sub-group of voters that voted for the winning gubernatorial candidate is fewer than 3000, the number of petition signatures that a new political party must collect will be an amount less than 150. If the size of the sub-group of voters that voted for the winning gubernatorial candidate is 3000 or greater, the amount of petition signatures that a new political party must collect will be 150.

In 2018, the per-district signature requirement in Montana's 100 legislative districts varied from a low of 55 signatures to a high of 150 signatures, depending on whether the voters in the legislative district gave a small number of votes to the previous winning candidate for governor or a large number of votes to the previous winning candidate for governor.  Twenty-six legislative districts had a signature requirement of 150 signatures, fifty-three legislative districts had a signature requirement that varied between 100 and 140 signatures, and twenty-one legislative districts had a signature requirement that varied between 55 and 95.

Plaintiffs argue that Montana's signature requirement for individual legislative districts violates the Fourteenth Amendment's Equal Protection Clause

-14-

because the signature amount required in each legislative district is not equal. Plaintiffs argue that the signature amount should be equal given that Montana's legislative districts are approximately equal in population.

Plaintiffs argue that Montana's per-district signature requirement violates the Equal Protection Clause because it allocates unequal voting power to registered voters in equally populated legislative districts. Plaintiffs argue that Montana's per-district signature requirement dilutes the value of the signatures of voters in legislative districts that cast more votes for the previous winning candidate for governor, and gives them less value than the signatures of voters in legislative districts that cast fewer votes for the previous winning candidate for governor. Plaintiffs argue that given this discrepancy in signature value, the registered voters in legislative districts that cast more votes for the previous winning candidate for governor have less influence on whether a minor political party appears on the ballot, than registered voters in legislative districts that cast fewer votes for the previous winning candidate for governor.

The equal protection argument asserted by Plaintiffs here is similar to equal protection arguments that have been rejected by federal appellate courts. See *Libertarian Party v. Bond*, 764 F.2d 538, 544 (8th Cir. 1985); *Semple v. Griswold*, 934 F.3d 1134, 1141-1142 (10th Cir. 2019). The Eighth and Tenth Circuits have

-15-

held that per-district signature requirements that are based on the percentage of votes cast in the legislative district in the last election, or on the number of registered voters residing in a legislative district, do not violate the Equal Protection Clause so long as the districts are approximately equal in population. *Id.*

In *Bond*, the plaintiffs challenged Missouri's per-district signature requirement for new political parties.  Missouri required a new political party to obtain signatures in all of its congressional districts in an amount equal to "at least one percent of the total number of votes cast in the district for governor in the last gubernatorial election," or obtain signatures in one-half of its congressional districts in an amount equal to "at least two percent of the total number of votes cast in the district for governor at the last gubernatorial election."  Mo. Rev. Stat. § 115.315(4) (1978).  *Bond*, 764 F.2d at 539.  The signature requirement in each of Missouri's nine congressional districts was different because the number of votes cast for governor in the previous election varied from district-to-district.  The number of petition signatures required in the congressional districts ranged from a low of 4,266 signatures to a high of 5,348 signatures.  *Id.* at 539 n.2.

The plaintiff argued "that [Missouri's] use of a [signature requirement] based on a percentage of votes cast in each district in the preceding gubernatorial

-16-

election, rather than a percentage of the population of each district," violated the Equal Protection Clause, because it imposed unequal signature requirements in legislative districts that were approximately equal in population. *Id.* at 544.

The Eighth Circuit rejected this argument. The Eighth Circuit held that the signature variance that resulted from a formula based on a percentage of votes cast in the district in the last gubernatorial election "d[id] not reflect an impermissible discrimination amongst voters" in violation of the Equal Protection Clause, given that Missouri's congressional districts were "virtually equal in population." *Id.* The Court found that Missouri's "percentage of votes formula [was] a reasonable method of measuring the number of potential petition signers in each district," and was superior to a "percentage of population formula" because the percentage of the population formula "failed to reflect the fact that not all residents of a district are registered to vote." *Id.*

In *Semple*, the plaintiffs challenged Colorado's per-district signature requirement for placing a constitutional amendment initiative on the ballot. Colorado required that any petition to place a constitutional amendment initiative on the ballot must be signed by at least two percent of the registered voters in each of Colorado's 35 state senate districts. *Semple*, 934 F.3d at 1138. The number of registered voters in each senate district varied significantly from district-to-

-17-

district. The number of registered voters in Colorado's senate districts varied from a low of 80,499 registered voters to high of 132,222 registered voters. *Id.* at 1138.

The plaintiffs in *Semple*, like Plaintiffs here, argued that Colorado's per-district signature requirement violated the Equal Protection Clause because it allocated unequal voting power to registered voters in equally populated legislative districts. The plaintiffs in *Semple* argued that Colorado's per-district signature requirement gave more voting power to the registered voters in senate districts with fewer registered voters, and "dilute[d] the voting rights of [registered voters] who live[d] in districts with a higher number of registered voters." *Id.* at 1139.

The Tenth Circuit rejected this argument. The Court held that a per-district signature requirement that is based on the number of registered voters in a legislative district does not violate the "one-person, one-vote guarantee" embodied in the Fourteenth Amendment so long as the State's legislative districts are "approximately equal" in population. *Id.* at 1142. The Tenth circuit reasoned that the one-person, one-vote guarantee is a "guarantee of equal representation, not voter equality," and "representation is equal [under the Equal Protection Clause]

when the total population in each district is equal." *Id.* at 1141 (citing *Evenwel v. Abbott*, ___ U.S. ___, 136 S. Ct. 1120, 1130-1131, 194 L. Ed. 2d 291 (2016).

The reasoning of these appellate courts applies equally as well here. Montana's 100 legislative districts are approximately equal in population. Because Montana has equally populous legislative districts, Montana does not violate the Equal Protection Clause when it requires minor political parties to comply with a per-district signature requirement that is based on the percentage of votes cast for the winning gubernatorial candidate in the last election.

Accordingly, IT IS HEREBY RECOMMENDED:

1.    Defendant's Motion for Summary Judgment (Doc. 41) should be GRANTED.

2.    Plaintiffs' Motion for Summary Judgment (Doc. 36) should be DENIED.

3.    Defendant's Motion to Exclude the Opinions of Plaintiffs' Expert Witness (Doc. 39) should be DENIED as moot.

4.    The Clerk of Court should be directed to enter judgment accordingly.

DATED this 28th day of February, 2020.

John Johnston
United States Magistrate Judge