**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| MONTANA GREEN PARTY; DANIELLE BRECK; CHERYL WOLFE; HARRY C. HOVING; DOUG CAMPBELL; STEVE KELLY; ANTONIO MORSETTE; TAMARA R. THOMPSON; ADRIEN OWEN WAGNER, *Plaintiffs-Appellants*, v. CHRISTI JACOBSEN, in her official capacity as Secretary of State for the State of Montana, *Defendant-Appellee.* | No. 20-35340 D.C. No. 6:18-cv-00087-BMM OPINION |

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, District Judge, Presiding

Argued and Submitted May 6, 2021
Portland, Oregon

Filed November 8, 2021

Before:  William A. Fletcher and Michelle T. Friedland,
Circuit Judges, and Frederic Block,[*] District Judge.

Opinion by Judge W. Fletcher

---

**SUMMARY**[**]

---

**Civil Rights**

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the Montana Secretary of State in an action brought by the Montana Green Party and eight registered voters seeking declaratory and injunctive relief against certain provisions of Montana's primary ballot access scheme.

Montana law offers two methods for a political party to qualify to hold a primary election.  First, a party shall hold a primary to nominate its candidates if, for any statewide office in one of the last two elections, it received votes totaling 5% or more of the total votes for the last successful gubernatorial candidate.  Alternatively, a political party may qualify for a primary if it submits a petition to the Secretary of State that is signed by a number of registered voters equal to 5% or more of the total votes cast for the successful candidate for governor at the last general election or 5,000 electors,

---

[*] The Honorable Frederic Block, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

whichever is less. The number must include the registered voters in *at least* one-third of the legislative districts equal to 5% or more of the total votes cast for the successful candidate for governor at the last general election in those districts or 150 electors in those districts, whichever is less.   The geographic distribution requirement is tied to the 100 districts of Montana's House of Representatives and requires a minimum number of signatures from at least 34 districts.

The panel first held that amendments to Montana's election law while the case was on appeal did not render the appeal moot because the amended law disadvantaged plaintiffs to a slightly greater degree than the previous law and did not fundamentally change either the challenged provisions or the applicable legal analysis.

The panel affirmed the district court's grant of summary judgment to the Secretary with respect to plaintiffs' claims of right of association and right to cast an effective vote under the First and Fourteenth Amendments. Citing *Jennes v. Fortson*, 403 U.S. 431, 438 (1971), the panel held that plaintiffs had not shown that the burden imposed by Montana's ballot access scheme was severe.   Montana's statewide signature requirement of 5,000 was only 0.97% of the total statewide vote for President in 2016 and only 0.72% of the total registered voters in that year.  Other aspects of Montana's ballot access scheme, including the filing deadline, and the geographic distribution requirement, similarly imposed relatively minor burdens.   As to the geographic distribution requirement, the panel held that plaintiffs failed to introduce concrete and specific evidence showing that the distribution requirement imposed a severe burden.  If anything, evidence showed that the requirement was not burdensome.   The panel accepted Montana's

argument that its ballot access scheme served the interest of ensuring that a new party has broad-based support and that only nonfrivolous parties appear on the ballot.

The panel held that the part of the distribution requirement indexed to 5% of the votes for the previous gubernatorial winner in each house district violated the "one person, one vote" principle in the Equal Protection Clause of the Fourteenth Amendment. The panel held that Montana's approach resulted in a significant disparity in how much each signature was worth in its house districts. Because Montana's distribution requirement arbitrarily diluted the value of the signatures of voters in house districts with a large number of supporters of the most recent gubernatorial winner, and because the resulting variation from district to district was so significant, the panel applied strict scrutiny. The panel concluded that the State provided no reason, much less a compelling reason, for requiring far more signatures in some equal-population districts than in others. Nor had the State explained why the number of signatures required should be indexed to votes for the last successful gubernatorial candidate, a rule that arbitrarily devalued the signatures of voters in house districts that most strongly supported the current governor. The panel reversed the district court's holding that the challenged provisions did not violate the right to equal protection under the Fourteenth Amendment.

**COUNSEL**

James C. Linger (argued), James Carter Linger Law Offices, Tulsa, Oklahoma; Quentin M. Rhoades, Rhoades Siefert & Erickson PLLC, Missoula, Montana; for Plaintiff-Appellant.

Hannah E. Tokerud (argued) and Patrick M. Risken, Assistant Attorneys General; Austin Knudsen, Attorney General; Attorney General's Office, Helena, Montana; for Defendant-Appellee.

---

**OPINION**

W. FLETCHER, Circuit Judge:

The Montana Green Party ("Green Party") and eight registered Montana voters (collectively, "Plaintiffs") brought suit against the Montana Secretary of State[1], seeking declaratory and injunctive relief against certain provisions of Montana's primary ballot access scheme. *See* Mont. Code Ann. § 13-10-601(2)(a), (b), (c), & (d) (2007). The district court granted summary judgment to the Secretary, holding that the challenged provisions of the scheme (1) do not violate the right of association and the right to cast an effective vote under the First and Fourteenth Amendments, and (2) do not violate the right to equal protection under the Fourteenth Amendment.

---

[1] When the district court issued the decision below, Corey Stapleton occupied the office of the Secretary of State of Montana. On January 4, 2021, Christi Jacobsen was sworn into the position. We **GRANT** the joint motion (DE 32) to substitute her as defendant.

6        Montana Green Party v. Jacobsen

We affirm as to the first holding, but reverse as to the
second.

## I.  Mootness

While this case was on appeal, Montana amended its
election law, changing in some respects the provisions
challenged by Plaintiffs.  *See* 2021 Mont. Laws, ch. 399 (S.B.
350).  We asked the parties to submit supplemental briefs
addressing whether the amendments mooted Plaintiffs'
appeal.  Plaintiffs contend that the amendments have not
rendered their appeal moot.  In *Northeastern Florida Chapter
of Associated General Contractors of America v. City of
Jacksonville*, 508 U.S. 656 (1993), a challenged ordinance
was amended during the course of litigation, lessening the
burden imposed on the challengers.  The Court held that the
amendment did not render the challenge moot, writing, "The
new ordinance may disadvantage [the challengers] to a lesser
degree than the old one, but . . . it disadvantages them in the
same fundamental way."  *Id.* at 662.  In the case before us,
the amended law disadvantages the Plaintiffs to a slightly
*greater* degree than the previous law.  The amendments do
not fundamentally change either the challenged provisions or
the applicable legal analysis.  We therefore conclude that the
amendments do not render Plaintiffs' appeal moot.

## II.  Background

Montana law offers two methods for a political party to
qualify to hold a primary election.  First, a party shall hold a
primary to nominate its candidates if, for any statewide office
in one of the last two elections, it received votes totaling 5%
or more of the total votes for the last successful gubernatorial
candidate.  Mont. Code Ann. § 13-10-601(1) (2021).  (This

provision was not changed by the 2021 amendment.)  As of 2018 (the relevant date when this case was presented to the district court), the last successful gubernatorial candidate had been Steve Bullock, who had received 255,933 votes in the 2016 election.  The five-percent threshold required a minor party to have received 12,797 votes statewide in order to qualify for a primary.  Neither the Green Party nor any other minor party qualified for a primary under this provision in 2018.  Indeed, no minor party has qualified for a primary under this provision since 2004, when the Green Party held a primary by virtue of its strong showing in the 2000 election.

Alternatively, a political party may qualify for a primary if it submits a petition to the Secretary of State that is:

> signed by a number of registered voters equal to 5% or more of the total votes cast for the successful candidate for governor at the last general election or 5,000 electors, whichever is less. The number must include the registered voters in *at least* one-third of the legislative districts equal to 5% or more of the total votes cast for the successful candidate for governor at the last general election in those districts or 150 electors in those districts, whichever is less.

2021 Mont. Laws, ch. 399 (S.B. 350), § 1(2) (emphasis added).  (The only change effected by the 2021 amendment was to replace "more than" with "at least."  *See* Mont. Code Ann. § 13-10-601(2)(b) (2009).)  The petition alternative is used only by minor political parties such as the Green Party.

8        MONTANA GREEN PARTY V. JACOBSEN

The petition provision has two requirements.  First, the total number of petition signatures statewide must be at least the lesser of:  (a) 5,000, or (b) 5% of the total votes cast for the most recent successful gubernatorial candidate.  Because the most recent operative 5% threshold in 2018 (based on the 2016 election) was 12,797, the lesser number of 5,000 satisfied the requirement.  Second, the provision includes a geographic distribution requirement tied to the 100 districts of Montana's House of Representatives.  The district boundaries were redrawn after the 2010 Census, and will be redrawn again in light of the 2020 Census.  The populations in each district are very close to equal immediately after redistricting in the wake of a census, but can become less equal in the subsequent ten years due to population movement.  A petition complies with the distribution requirement if, for 34 of the 100 house districts, it includes signatures numbering the lesser of (a) 150, or (b) 5% of the votes cast in that district for the most recent successful gubernatorial candidate.

Because the distribution requirement is tied to the votes cast in each house district for the winner of the gubernatorial race, the required number depends on the political orientation of a district, and varies substantially from one district to another.  This may be illustrated by a comparison of the votes received in 2016 in House District ("HD") 35, a rural district on the border with North Dakota, with those received in HD 100, a district in downtown Missoula.[2]  In HD 35, Steve Bullock, the Democratic gubernatorial candidate, received 1,085 votes, while Greg Gianforte, the Republican candidate,

---

[2] Mont. Sec. of State, *2016 Statewide General Election Canvass by House District*, at 16, 19, https://sosmt.gov/wp-content/uploads/attachments/2016StatewideHD.pdf.

received 3,577 votes. In HD 100, Bullock received 4,916 votes, while Gianforte received 894 votes. As a result, the "votes cast for the successful candidate for governor at the last general election" in these districts varied dramatically— from 1,085 in HD 35 to 4,916 in HD 100. HD 35 therefore required only 55 petition signatures, while HD 100 required 150 signatures (the ceiling number). In the lead-up to the 2018 election, 21 house districts required between 55 and 99 petition signatures, 53 house districts required between 100 and 140 signatures, and 26 house districts required 150 signatures.

When Montana first adopted its distribution requirement in 1981, the signature requirement in each district could only be satisfied by 5% of the votes for the previous gubernatorial winner. *See* Mont. Code Ann. § 13-10-601 (1997). In 1999, the legislature added the 150-signature ceiling as a disjunctive option. *See* Mont. Code Ann. § 13-10-601 (1999). Montana has no petition distribution requirement for statewide independent candidates or independent presidential candidates.

Under the law in effect for the 2018 election, a political party had to present the signed petitions and accompanying affidavits to the relevant county election administrators no later than 92 days before the date of the primary. Mont. Code Ann. § 13-10-601(2)(c), (2)(d) (2009). Election administrators were required to verify the signatures and forward petitions to the Secretary of State no later than 85 days before the primary. *Id.* If a party qualified for listing in a primary, the Secretary approved the petition and certified the party for the primary. If a party did not qualify, voters remained free to write in a vote for a candidate from that party. *Id.* § 13-10-211.

10       MONTANA GREEN PARTY V. JACOBSEN

Sections 13-10-601(2)(c) and (2)(d) were modified by the 2021 amendment.  Petitions now must be submitted to county administrators no later than 123 days before the election. Petitions and accompanying affidavits must be submitted to the relevant county officials "no later than 4 weeks before the final date for filing the petition with the secretary of state as provided in [section 4(2)]."  Section 4(2) requires election administrators to verify the signatures and forward petitions to the Secretary "at least 95 days before the date of the primary."  2021 Mont. Laws, ch. 399 (S.B. 350), §§ 1(3), 4(2).

In 2018, the deadline for filing petitions was March 5. Before that date, the Green Party had submitted 10,160 signatures to county election administrators, collected from at least 38 house districts.  (As will be discussed in a moment, the signatures from eight of those districts were challenged. The record reveals the identity of those districts.  The record does not reveal the identity of the other 30 districts.)  Of the 10,160 signatures, 699 were collected by the Green Party and its representatives.  The other 9,461 were obtained by a Nevada political consulting organization called Advanced Micro Targeting ("AMT").  *Larson v. State*, 434 P.3d 241, 248 & n.2 (Mont. 2019).  AMT collected these signatures by employing thirteen signature-gatherers working for three weeks in four populous counties:  Cascade, Missoula, Lewis and Clark, and Yellowstone.  *Id.* at 248.  It is not clear in the record who hired AMT.  According to a stipulation filed in the district court:

> The Green Party was aware of the theory that AMT was trying to get the Party on the ballot to affect the United States Senate race in Montana.  The Green Party never spoke with

> AMT, did not hire AMT, and did not
> appreciate AMT's "assistance" because it
> threw the Green Party into "politics-as-usual"
> game-playing instead of convincing voters of
> the merits of the Party's ideals.

After verifying 7,386 signatures on the petitions, county administrators timely forwarded the petitions to the Secretary of State. On March 12, Secretary Stapleton concluded that the Green Party had satisfied the petition requirements, including the geographic distribution requirement in 38 house districts. He approved the Green Party for the ballot.

The Montana Democratic Party and three voters filed suit in state court challenging some of the petition signatures. The court invalidated 87 signatures from eight house districts after finding signature irregularities such as a lack of a printed name or a false affidavit by the signature gatherer. *Larson*, 434 P.3d at 250. The Montana Supreme Court affirmed. *Id.* at 247. As a result, the Green Party met the distribution requirement in only thirty districts, and the Secretary of State decertified the Green Party from the 2018 ballot. With just thirteen additional valid signatures in four of the districts, the Green Party would have met the distribution requirement.

### III.  Procedural Background

On August 13, 2018, the Green Party and eight registered Montana voters brought suit in federal district court against the Secretary of State in his official capacity. Three of the voter-plaintiffs had signed 2018 petitions: Danielle Breck, of Missoula; Harry C. Hoving of Billings; and Antonio Morsette of Box Elder.

Plaintiffs argued that Montana's primary ballot access scheme—in particular, the combined effect of the signature requirement, the filing deadline, and the distribution requirement—violated their rights of association and effective voting under the First and Fourteenth Amendments, and violated their right to equal protection under the Fourteenth Amendment. Both parties moved for summary judgment.

On February 28, 2020, the magistrate judge recommended that the district court grant summary judgment to the Secretary. On March 20, the district court adopted the findings and recommendations of the magistrate judge and entered judgment for the Secretary. Plaintiffs timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## IV. Analysis

We review de novo a grant of summary judgment. *Kaahumanu v. Hawaii*, 682 F.3d 789, 796 (9th Cir. 2012).

### A. Right of Association and Right to Cast an Effective Vote

Ballot access restrictions potentially burden two different rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). These rights are protected by the First Amendment, as incorporated into the Fourteenth Amendment.

MONTANA GREEN PARTY V. JACOBSEN          13

In determining the constitutionality of election laws, we analyze a ballot access scheme as a whole. *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 730 (9th Cir. 2015). We weigh "the character and magnitude of the asserted injury" against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). Plaintiffs bear the burden of making a factual showing of injury. *Democratic Party of Haw. v. Nago*, 833 F.3d 1119, 1123–24 (9th Cir. 2016). When plaintiffs' rights are subject to "severe" restrictions, the law must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. When a law imposes only "reasonable, nondiscriminatory restrictions" on voters' rights, the State's "important regulatory interests are generally sufficient to justify" the law. *Id.* (quoting *Anderson*, 460 U.S. at 788); *see Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011) (noting that narrow tailoring is not required).

Plaintiffs have not shown that the burden imposed by Montana's ballot access scheme is severe. In *Jenness v. Fortson*, 403 U.S. 431, 438 (1971), the Supreme Court upheld a Georgia law requiring independent candidates to file a nominating petition signed by at least 5% of the number of registered voters in the last general election for the office in question. Montana's scheme is far less burdensome. Its statewide signature requirement of 5,000 was only 0.97% of the total statewide vote for President in 2016 and only 0.72% of the total registered voters in that year. *See Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1092 (9th Cir. 2019) (noting that courts consider the percentage of the total "available pool" of signers).

Other aspects of Montana's ballot access scheme similarly impose relatively minor burdens. *See Jenness*, 403 U.S. at 438 (emphasizing that Georgia's law imposed no "suffocating restrictions" on petitions). In 2018, petitions had to be submitted to county administrators 92 days before the primary. *See* Mont. Code Ann. § 13-10-601(2)(c), (2)(d) (2009). Under the 2021 amendments, petitions must be submitted 123 days before the primary. *See* 2021 Mont. Laws, ch. 399 (S.B. 350), §§ 1(3), 4(2). Both deadlines afford signature gatherers more time than deadlines that we have upheld in other cases. *See, e.g.*, *Ariz. Green Party v. Reagan*, 838 F.3d 983, 987, 992 (9th Cir. 2016) (upholding a filing deadline 180 days before the primary). While collecting signatures might be difficult during Montana winters, signatures may be gathered at any time before the deadline. Montana also allows write-in votes, so voters may vote for their preferred candidates even when their preferred party does not qualify for a primary. *See* Mont. Code Ann. § 13-10-211. In 2018, several of the voter-plaintiffs availed themselves of this opportunity.

At first glance, Montana's geographic distribution requirement may appear significantly burdensome. While we have described distribution requirements as "commonplace," most other States base their distribution requirements on federal congressional districts rather than on state legislative districts. *See Angle v. Miller*, 673 F.3d 1122, 1130–31 (9th Cir. 2012) (upholding a distribution requirement based on active registered voters in each of Nevada's three congressional districts); *see also*, *e.g.*, Ohio Rev. Code Ann. § 3517.01(A)(1)(b)(ii) (requiring 500 signatures from each of 8 of Ohio's 15 congressional districts). Montana's rule is based on house districts—a far smaller unit—and requires a minimum number of signatures from at least 34 districts.

Plaintiff Breck testified that it is difficult as a practical matter to decide which districts a minor party should target for obtaining signatures. Because house district lines are not the same as county lines, organizers who have collected signatures from several districts may have to turn in the petitions to multiple county election officials. In some cases, it may be unclear to signature gatherers in which house district a voter resides, making it difficult to determine whether the voter's signature qualifies for the targeted district.

However, Plaintiffs did not introduce concrete and specific evidence showing that the distribution requirement imposed a severe burden. *See Ariz. Green Party*, 838 F.3d at 990; *Ariz. Libertarian Party*, 798 F.3d at 731. They failed to introduce evidence showing how many people were collecting signatures, when they began collecting signatures, how long it took for them to collect the signatures, or the cost of collecting signatures. *See Ariz. Green Party*, 838 F.3d at 990 (characterizing the burden as "purely speculative" because of similar evidentiary failures). If anything, evidence now in the record shows that the requirement is not burdensome. The Green Party (with the "assistance" of AMT) very nearly complied with the distribution requirement in 2018, missing the threshold by "a mere 13 petition signatures." Given that Montana house districts are small and have roughly equal populations, many districts are in and around the populous areas of the State. As a result, the distribution requirement does not require petition gatherers to spend significant efforts collecting signatures in far-flung, sparsely populated areas. We note, for example, that AMT collected its 9,461 signatures in only four populous counties. Finally, past experience suggests that the burden of Montana's ballot access laws is not severe. *See Storer v.*

*Brown*, 415 U.S. 724, 742 (1974). Minor parties have satisfied the petition requirement at least seven times since 1982.

Because Plaintiffs have not shown a severe burden on ballot access, Montana may justify its election scheme by pointing to "important regulatory interests." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). States have an important interest in requiring that a party make "some preliminary showing of a significant modicum of support" so the state can "avoid[] confusion, deception, and even frustration of the democratic process." *Jenness*, 403 U.S. at 442. A distribution requirement may be justified by the interest of ensuring that a party has more than "localized support." *Angle*, 673 F.3d at 1135. Where the burden imposed on ballot access is not severe, we generally do not require "a particularized showing" of a State's justifications. *Hobbs*, 925 F.3d at 1094 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986)).

We accept Montana's argument that its ballot access scheme serves the interest of "ensuring that a new party has broad-based support and that only nonfrivolous parties appear on the ballot." Similarly, we conclude that the 128-day filing deadline is justified on the ground that election administrators need time to perform the many required tasks after a party submits its petitions to county officials.

Where the burden is not severe, a ballot access scheme need not be narrowly tailored. *See Dudum*, 640 F.3d at 1114. While Montana's house districts are small, they are not an unreasonable basis for the distribution requirement. In 2018, Montana could not base its requirement on congressional districts, as it then had only one. As of the 2022 election,

MONTANA GREEN PARTY V. JACOBSEN          17

Montana will have two congressional districts, but that will not fundamentally change the analysis. We note that Montana has not imposed a distribution requirement for statewide independent candidates or for independent presidential candidates, which suggests that it is not equally concerned about all candidates who may be "frivolous" or who lack "broad-based support." But this differential treatment makes little difference at a low level of scrutiny.

We therefore affirm the district court's grant of summary judgment to the Secretary with respect to Plaintiffs' claims of right of association and right to cast an effective vote under the First and Fourteenth Amendments.

### B. Right to Equal Protection

Plaintiffs also argue that the distribution requirement tied to 5% of the votes for the most recent gubernatorial winner violates the "one person, one vote" principle in the Equal Protection Clause of the Fourteenth Amendment. *See Reynolds v. Sims*, 377 U.S. 533 (1964). We agree with Plaintiffs.

### 1. Article III Standing

As a preliminary matter we address Article III standing. We agree with the Secretary that the Green Party lacks Article III standing to challenge the 5% alternative requirement under the Equal Protection Clause. Compared to the previous flat per-district requirement of 150 signatures, the later-enacted 5% requirement advantages the Green Party in house districts where it results in a requirement of less than 150 signatures.

The Secretary has not argued that the individual plaintiffs lack Article III standing, but we are obliged to raise the issue *sua sponte*. *See Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (en banc). At least one of the individual plaintiffs has standing. While the record does not reveal in which house districts the voter-plaintiffs reside, one of the three who signed a petition (Breck) is a resident of Missoula. We take judicial notice of maps and official election results from the Montana Department of State website.[3] *See Dudum*, 640 F.3d at 1101 n.6 (taking judicial notice of official election results); Fed. R. Evid. 201(b)(2), (d) (explaining that courts may take judicial notice, "at any stage of the proceeding," of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). In 2018, the greater Missoula area encompassed eleven house districts: HDs 89, 90, 91, 92, 94, 95, 96, 97, 98, 99, and 100. Official 2016 gubernatorial results in these districts indicate that these eleven house districts had signature requirements between 138 and 150, significantly more than the requirements in many of the other districts. Because Breck's signature on the petition was weighted substantially less than those of voters in those other districts, and will do so in the future, the inequality caused, and will cause, her injury in fact.

---

[3] *See* Mont. Sec. of State, *Montana Legislative Districts for Elections Held in 2014-2022*, https://sosmt.gov/Portals/142/Elections/Documents/Legislative-Map.pdf; Mont. Sec. of State, *2016 Statewide General Election Canvass by House District*, at 19, https://sosmt.gov/wp-content/uploads/attachments/2016StatewideHD.pdf.

2.  One Person, One Vote

The "one person, one vote" principle extends to signatures on nominating petitions because such petitions are "an integral part of [an] elective system." *Moore v. Ogilvie*, 394 U.S. 814, 818 (1969).  In *Moore*, the Supreme Court struck down an Illinois statute that required an independent candidate to collect signatures of 200 voters from each of at least 50 of the state's 102 counties.  *Id.* at 815.  The statute violated "one person, one vote" because the counties had disparate populations, and the statute applied "a rigid, arbitrary formula to sparsely settled counties and populous counties alike."  *Id.* at 818.  The Court held that the statute was not justified by the state's purported goal of "requir[ing] statewide support for launching a new political party rather than support from a few localities."  *Id.*

We apply strict scrutiny to "state laws treating nomination signatures unequally on the basis of geography."  *Idaho Coalition United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 (9th Cir. 2003).  In *Idaho Coalition*, we struck down an Idaho statute requiring initiative petitions to include signatures from 6% of the population in each of 22 of the state's 44 counties.  *Id.* at 1076–77.  Because 60% of Idaho's population resided in just nine of its 44 counties, the rule "favor[ed] voters in sparsely populated areas over those in more densely populated areas."  *Id.* at 1075.  We concluded that Idaho's goals—"preventing a long and confusing list of initiatives from appearing on the ballot, protecting against fraud, informing the electorate, ensuring the 'integrity' of the ballot process, and promoting 'grassroots direct legislation efforts'"—could be advanced "as effectively and efficiently" by a system treating voters equally in the various counties. *Id.* at 1079.

20       MONTANA GREEN PARTY V. JACOBSEN

In *ACLU of Nevada v. Lomax*, 471 F.3d 1010, 1020–21 (9th Cir. 2006), Nevada's "13 Counties Rule" required initiative proponents to gather signatures of 10% of the registered voters who voted in the last general election, in each of 13 of the State's 17 counties. Because Nevada's counties had unequal populations, we applied strict scrutiny and struck down the Rule. But we later upheld Nevada's distribution requirement after the State revised it to rely on equally populated congressional districts. *See Angle*, 673 F.3d 1122. Nevada's new "All Districts Rule" required the signatures of 10% of the registered voters who had voted in the last general election in each of the State's congressional districts. Applying rational basis review, we upheld this requirement because it "grant[ed] equal political power to congressional districts having equal populations." *Id.* at 1129 (emphasis omitted). The parties in *Angle* did not mention the fact that the congressional districts inevitably would have had at least slightly different numbers of registered voters who had voted in the last general election. In our decision, we did not mention or consider the potential significance of this difference.

The Montana signature requirement—like Nevada's All Districts Rule, which we upheld in *Angle*—applies to equally populated districts. However, for two reasons, Montana's requirement—unlike Nevada's All Districts Rule—does not "grant[] equal political power" to those districts. *Id.* First, the signature requirement in Nevada turned on the total number of people who voted in the most recent election. By contrast, the requirement in Montana turns on the number of people who voted for the winner of that election. By tying the signature requirement to the partisan character of each district rather than to the total number of votes cast, the Montana scheme applies a non-neutral criterion that results in

substantial partisan-based variation from district to district. Second, the distribution requirement in *Angle* was tied to federal congressional districts. By contrast, the Montana requirement is tied to much smaller state house districts, with the result that there is potential for even greater variation from district to district.

Montana's approach results in a significant disparity in how much each signature is "worth" in its house districts. In 2018, the highest signature requirement in Montana (150 signatures) was 2.73 times the lowest requirement (55 signatures). In effect, the signature of a voter in a district with the lowest requirement counted nearly three times more than the signature in a district with the highest requirement. We note that the variation in *Angle*—which the attorneys in that case did not bring to our attention, and which we did not consider—was significantly less. According to the website of the Nevada Secretary of State, the congressional district with the greatest number of actual voters when *Angle* was being litigated (District 3, with 423,674 voters) had 1.44 times more active voters than the district with the fewest active voters (District 1, with 293,814 voters).[4] Because Montana's distribution requirement arbitrarily dilutes the value of the signatures of voters in house districts with a large number of supporters of the most recent gubernatorial winner, and because the resulting variation from district to district is so significant, we apply strict scrutiny.

The 5% provision of Montana's distribution requirement fails strict scrutiny. The State has provided no reason, much

---

[4] Nev. Sec. of State, *Voter Registration Statistics, January 2010*, https://www.nvsos.gov/sos/elections/voters/voter-registration-statistics/ 2010-statistics/voter-registration-statistics-jan-2010-congress.

less a compelling reason, for requiring far more signatures in some equal-population districts than in others. Nor has the State explained why the number of signatures required should be indexed to votes for the last successful gubernatorial candidate, a rule that arbitrarily devalues the signatures of voters in house districts that most strongly supported the current governor.

The out-of-circuit cases cited by the Secretary do not compel a contrary conclusion. In *Libertarian Party v. Bond*, 764 F.2d 538, 544 (8th Cir. 1985), the Eighth Circuit upheld a Missouri distribution requirement that mandated signatures equal to a certain percentage of the total votes in each congressional race in the gubernatorial race. In *Semple v. Griswold*, 934 F.3d 1134, 1137 (10th Cir. 2019), the Tenth Circuit upheld a ballot initiative requiring initiative proponents to collect signatures from 2% of registered voters in each of Colorado's 35 senate districts. Both the total number of prior votes cast, as in *Bond* and *Angle*, and the total number of registered voters, as in *Semple*, are neutral criteria, unrelated to partisan considerations. Moreover, as the court in *Bond* observed, the "'percentage of votes' formula is a reasonable method of measuring the number of potential petition signers in each district." *Bond*, 764 F.2d at 544. The same is true of the registered voters formula in *Semple*. By contrast, Montana's formula is linked to the partisan composition of the different house districts, and is not a reasonable approximation of the number of potential petition signers in each district.

We note, in addition, that the formulae in *Bond* and *Semple* resulted in relatively minor differences among districts. The largest signature threshold in *Bond* was only 1.25 times that of the smallest, and the largest in *Semple* was

just 1.64 times that of the smallest. *See Bond*, 764 F.2d at 540, 544; *Semple*, 934 F.3d at 1138. These differences are much less than in Montana in 2018, when, as we noted above, one person's signature counted as much as 2.73 times as that of another person.

We hold that the part of the distribution requirement indexed to 5% of the votes for the previous gubernatorial winner in each house district violates equal protection. We therefore reverse the district court's grant of summary judgment to the Secretary with respect to Plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment. Neither party has addressed the question whether the invalid distribution requirement is severable from the rest of Montana's primary ballot access scheme.

## Conclusion

On the First and Fourteenth Amendment claims, we affirm the district court's grant of summary judgment. On the Fourteenth Amendment equal protection claim, we reverse the district court. We remand for proceedings consistent with this opinion. The parties shall bear their own costs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**